THE NEMAHA COAL AND MINING Co. *et al.* v. SETTLE & KEITH.

1. CORPORATION — *When a Complete Organization.* While the existence of a corporation dates from the time of filing its charter, it cannot be regarded as a complete organization authorized to transact business when the subscription books of the corporation have not yet been opened, and no stock has been subscribed; nor can it be until a full and complete organization has been effected in accordance with the requirements of the statute. (*Walton v. Oliver*, 49 Kas. 107.)

2. SUBSCRIPTION, *Cannot be Enforced, When.* An indefinite agreement to subscribe for capital stock in a corporation to be organized, which does not specify the amount of capital stock to be employed, what proportion of the capital stock the subscriber is to take, nor when or by whom the company is to be organized, cannot be enforced.

*Error from Nemaha District Court.*

ACTION by *Settle & Keith* against *The Nemaha Coal and Mining Company* and others. There was a judgment for plaintiffs, and defendants come to this court. The opinion herein, filed December 8, 1894, states the facts.

*B. A. Seaver,* and *E. G. Wilson,* for plaintiffs in error.

*Wells & Wells,* for defendants in error.

The opinion of the court was delivered by

JOHNSTON, J.: This was an action to foreclose mortgages and adjust mortgage liens existing upon a tract of land in which the Nemaha Coal and Mining Company had an interest. That company was organized in 1885, to prospect for and mine coal and other minerals. In the following year, in prospecting for coal, it found what it supposed to be valuable mineral water at a depth of 57 feet, when it changed its plans, and some of its members projected the formation of another company, which should buy and own the land on which the well was located. Terms were arranged for the transfer of the land to the prospective mineral-water company, and the coal and mining company conveyed the land,

subject to certain incumbrances, to a trustee for the use and benefit of a mineral-water company to be organized by the stockholders of the coal and mining company and their associates. It was stipulated that the trustee should, upon compliance with certain conditions, transfer the land to the proposed mineral-water company. In January, 1887, a charter was filed in the office of the secretary of state for the incorporation of the mineral-water company, under the name of "The Nemaha Medical and Mineral Artesian Well and Improvement Company," and in June, 1887, the trustee conveyed the land in question to that company. F. M. Johnson held a mortgage against the land, which was assigned to the defendants in error, Settle & Keith, after the transfer heretofore mentioned had been made. When the coal and mining company determined to organize the mineral-water company, it entered into a contract with F. M. Johnson, which is as follows:

"Nemaha Coal and Mining Company Works, October 28, 1886.—Article of agreement entered into by and between F. M. Johnson, of the first part, and Nemaha Coal and Mining Company, of the second part, witnesseth: That the party of the first part has this day sold the south half of the southwest quarter of section twenty-two (22), town one (1), range twelve (12), for the sum of $2,750, to the party of the second part. The party of the second part agrees to pay to the party of the first part $500 cash, assume the Bartlett mortgage of $750, the balance being a mortgage of $1,500 held by F. M. Johnson, of the first part. Now, the understanding is that the party of the first part agrees to take the amount of that mortgage in water stock, as soon as said water company is organized; and it is further understood, that the party of the first part is to have possession of the buildings he now occupies on said land until the expiration of the time given in the said $1,500 mortgage held by the party of the first part. The above $1,500 mortgage is drawn payable without interest.                        F. M. JOHNSON.

J. F. SWARTZ, *President.*
J. Q. DICKEY, *Supt.*"

The charter of the mineral-water company provided that the capital stock should be $50,000, divided into 5,000 shares

of $10 each. There was an election of officers by that company after it was chartered, and they procured a seal and a book of certificates of stock, but no stock subscription book was ever opened, and no shares of the capital stock were ever subscribed for, and no assessments were ever made upon the stockholders of the company. In May, 1887, a meeting was held by the company for the issuance of certificates of water stock to F. M. Johnson, and the president was authorized to tender the stock to him. Afterward, the president tendered a certificate of stock for 300 shares, being double the amount mentioned in the contract, which Johnson declined to accept. When Settle & Keith attempted to recover on the debt assigned to them by Johnson and to foreclose their mortgage, it was insisted by the coal and mining company that the agreement made between it and Johnson was binding upon Settle & Keith, and should be enforced. The district court declined to enforce that contract, and foreclosed the mortgage of Settle & Keith.

We fail to see that error was committed in the rulings that were made. It is a serious question whether the coal and mining company had any authority to engage in the water business or make the contract which it attempted to make; but, apart from that question, we think that no mistake was made by the court in refusing to enforce the agreement. It will be seen that it was singularly vague and indefinite. While it provided that Johnson should take water stock for his mortgage as soon as a water company should be organized, it did not stipulate when or by whom it should be organized; there was no statement of the total amount of the capital stock nor the number of shares into which it should be divided. It is a very important question to those who are going to engage in a corporate enterprise that the amount of capital stock should be known, and the share which they are to contribute toward raising the capital, as well as to understand the liabilities which will be assumed upon the stock, in case of misfortune or loss. In this case a water company was subsequently chartered, but those who obtained the char-

ter have not subscribed any stock nor assumed any liability. The testimony shows that no *bona fide* working organization had been completed when the tender of stock was made to Johnson. It is true the statute provides that the existence of a corporation shall date from the filing of the charter, but there must be a substantial compliance with all the provisions of law governing corporations before it can be said to have such an existence as will entitle it to do business.

The question of when a corporation is organized and authorized to transact business was before the court in the case of *Walton v. Oliver*, 49 Kas. 107. It was there said that "the words 'organize' or 'organization' have a well-understood meaning; and as we construe them, they mean the election of officers, providing for the subscription and payment of the capital stock, the adoption of by-laws, and such other steps as are necessary to endow the legal entity with the capacity to transact the legitimate business for which it was created." See, also, *Bridge Co. v. Cummings*, 3 Kas. 55; *Hunt v. Bridge Co.*, 11 id. 439; *Water and Light Co. v. City of Aspen*, 37 Pac. Rep. (Colo.) 728.

As no stock was subscribed, it cannot be held, under the above rule, that the organization was complete. When it attempted to compel Johnson to subscribe, the subscription books had not been opened, and there was not a *bona fide* stockholder in the concern. If the agreement had been enforced, he would have been the only stockholder, and he alone would have been compelled to shoulder all the burdens as well as the benefits, if there were any, of the company. While none of the other parties had taken any of the stock, they generously tendered him shares the face value of which was double the amount of his debt.

In view of the fact that the water company was in debt, and of the further fact that a double liability attaches to stock under our law, the amount of stock tendered was a matter of great concern. As has been seen, it is a matter of importance to him to know how much capital was to be invested, and what share of the whole he was to contribute. He might be

willing to engage in the venture if he was to provide a tenth of the capital, but entirely unwilling if he should be required to furnish a half or the whole of the capital. Before the payment of a subscription can be compelled, the capital to be employed must be fixed and certain, and a *bona fide* subscription must have been made, and a complete organization effected. Under the testimony in this case, we think the court ruled correctly in declining to compel the payment of the subscription, or to enforce the agreement made between the coal and mining company and F. M. Johnson. The judgment will be affirmed.

All the Justices concurring.