A. L. OSBORNE *et al v.* M. D. ALLEN *et al.*

(*Knoxville.* September Term, 1920.)

1. APPEAL AND ERROR. Complainant repelled on court's own motion for unclean hands, regardless of absence of ruling on demurrer.

On appeal in a suit in equity, it is immaterial that a demurrer on the ground that the bill showed complainant participated in the illegal acts, was not ruled upon, since the Supreme Court will, of its own motion, repel the complainant if the record shows that his participation in the illegal transactions brought him within the maxim requiring him to come into equity with clean hands. (*Post, pp.* 346-350.)

Acts cited and construed: Acts 1915, ch. 118.

2. HIGHWAYS. Statute held not to authorize a change of location by road commissioners.

Private Acts 1915, chapter 118, as amended by chapter 636 of the same Legislature authorizing construction of a road between two *termini* passing by three designated places, though it does not deprive the road commissioners of all discretion in locating the road, does prevent their locating it so as not to pass within half a mile of one of the designated places. (*Post, p.* 350.)

3. CONTRACTS. Note to secure illegal location of highway cannot be collected.

A note payable to the road fund given to induce the road commissioners to locate a highway by the maker's farm, which was contrary to the act authorizing the highway, partakes of the illegality of the transaction so as to render its collection unenforceable. (*Post, pp.* 351, 352.)

4. HIGHWAYS. Contribution to road fund to influence discretion in location is illegal.

Osborne v. Allen.

A contribution of money to the road fund, made for the purpose of influencing the discretion of the commissioners in locating the road, is contrary to public policy and illegal, though the commissioners had authority to locate the road on the desired line. (*Post, pp.* 352, 353.)

5. HIGHWAYS. Good faith of commissioners does not purge contribution to road fund of illegality.

The fact that road commissioners acted in good faith in locating a highway along the best line, uninfluenced by a contribution made to the road fund to induce location along that line, does not make the contribution legal. (*Post, pp.* 353, 354.)

6. HIGHWAYS. Fact that contribution to influence location was paid into road fund does not purge illegality.

A contribution of money to induce the location of a highway along a particular line is illegal, though it was paid into the highway funds of the county, and not to any officer. (*Post, pp.* 353, 354.)

7. EQUITY. Equity will not restrain action on note, where maker participated in illegality.

Where the maker and the payees of a note alike participated in the illegal transaction in connection with which the note was given, equity will not aid the maker by restraining an action at law against him to enforce the payment of the note; the maxim that "he who comes into equity must come with clean hands" being applicable. (*Post, pp.* 354, 355.)

8. INJUNCTION. Equity, on dismissing suit to restain action on illegal note, will not grant other relief.

Though ordinarily in a suit to restrain the prosecution of an action at law equity will require judgment to be confessed on dismissal of the bill or will render the judgment which should be rendered in that action, it will not give any directions where the action at law was on a note void for illegality in which both parties participated, but in such case will merely dismiss the complainant's bill, and leave the parties to work out their rights and defenses in the action at law. (*Post, p.* 355.)

Case cited and approved: Haynes v. Bank, 106 Tenn., 425.

FROM CARTER.

Appeal from the Chancery Court of Carter County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court—HON. HAL H. HAYNES, Chancellor.

MILLER, SEILER & HUNTER, for appellants.

ALLEN & CLARK, for appellees.

MR. L. D. SMITH, Special Justice, delivered the opinion of the Court.

The purpose of the original and amended bills in this case was to enjoin the defendants who were road commissioners from prosecuting an action at law pending in the circuit court for the collection of a $500 note given by the complainant A. L. Osborne to the road commissioners, and to have the note delivered up and canceled and the transaction declared illegal and void.

The ground of the complaint is that the note was fraudulently obtained, was without consideration, and was the result of an illegal transaction by the road commissioners, in that it was procured for the purpose of enlarging the road fund and in order to induce the road commissioners to change the location of the road, contrary to the statute, and in violation of public policy.

The complainant resorted to a court of equity upon the theory that his defenses were embarrassed at law.

A demurrer was interposed to the original bill upon the ground that under the facts stated the complainants should be repelled from a court of equity, because the bill showed upon its face that the complainant Osborne was a party to the alleged illegal contract. No action was taken upon the demurrer, but this is immaterial, as the court of its own motion will repel the complainant if upon the record it appears that his participation in the transactions was of such nature as to fall within the equitable principle that "he who comes into equity must come with clean hands."

The court of civil appeals concurred in the view of the chancellor that there was no fraud in the transaction; that the road commissioners acted in good faith, and as best to subserve the public trusts which they were endeavoring to execute as the same appeared to them, and that it was not against public policy for such officials acting in good faith and in accordance with their best judgment to accept subscriptions of money to augment the road fund; and that, the transaction being susceptible of a construction consistent with good faith and the public weal, and the complainant, having gotten the benefit of the location and construction of the road, in compliance with the requirements of his note, cannot be heard to complain, because it was procured either fraudulently, illegally, or without consideration.

There was no confession of judgment upon the suit at law required, and none was rendered by the final decree of the chancellor. The suit was merely dismissed, the in-

Osborne v. Allen.

junction dissolved, leaving the complainant with only such defenses as he could make in the suit at law.

The real question in this case is whether the public officials charged with the duty of expending public money in the construction of roads could lawfully accept contributions to the road fund for the purpose of influencing the location of a road.

We are constrained by considerations of public policy to radically differ with the view expressed by the chancellor, and the court of civil appeals, and to hold that the transaction in this case was one beyond the power of the road commissioners, contrary to public policy, and violative of the very act under which they were proceeding.

While there is no moral turpitude connected with the transaction upon either side, and no bad faith upon the part of either party, nevertheless the public officials, having their duties pointed out to them by the legislature, will not be permited either to violate the law or to have their discretion with respect to the location of the road influenced by contributions from citizens and thus open the door to fraud and graft, and introduce into their duties *ultra vires* considerations in the performance of their public duties.

The material facts of this case are undisputed, and in so far as they are referred to in the opinion of the court of civil appeals they constitute a concurrent finding by that court and the chancellor.

Chapter 118 of the Acts of 1915 provides for the locating, building, completing, repairing and maintaining the

public roads, turnpikes and bridges of Carter county described in the act, and authorizes the issuance of bonds, and provides for commissioners and other agencies to carry out the provisions of the law. Section 4 of the act provides that the proceeds of the bonds shall be used and expended in locating and constructing certain specified roads. The road in controversy in this case is described as:

"A road beginning at Siam and leading to Elizabethton."

Section 6 gave power to the commissioners—"to make all changes in the location of said roads deemed necessary to the best and most economical construction of the same (not however to change the general courses of said roads and turn-pikes herein specified)."

As the act thus stood the road commissioners had a discretion in the location of this road between Siam and Elizabethton. But by chapter 636 of the acts of the same legislature, the act was amended so as to more specifically describe the location of the road in question. In the amended act it is described as follows:

"A road beginning at or near Siam Station on the V. & S. W. Railway, thence through 'the Neck country by way of R. B. Hyder's residence to Doe river; thence down the east side of Doe river, by way of Toncray's springs, to the courthouse in Elizabethton, approximately five miles."

The complainant Osborne owned a farm of about two hundred acres between Siam Station and Elizabethton, and was anxious to have the road constructed by his farm. The route of the road called for in the act was to run by

the way of R. B. Hyder's residence of Doe river. If this provision of the act had been complied with, the road would have missed the complainant's farm a half-mile or more. In order to induce the road commissioners to build the road by his place, instead of by Hyder's, the complainant offered to contribute $500 to the augmentation of the public pike funds to be used in the construction of the road. This proposition was accepted by the road commissioners, and thereupon the complainant executed and delivered to them the note, the collection of which is sought to be enjoined by the bill in this case. The note reads as follows:

"Bristol, Tennessee, November 27, 1915.

"On demand, subject to the conditions hereinafter set forth, I promise to pay to the board of road commissioners of Carter county, Tennessee, the sum of five hundred dollars at the First National Bank of Elizabethton, Tennessee. But this note is given as an inducement to said board to construct a macadamized road alongside or through the lands owned by me which now fronts on the Siam road; and shall therefore be automatically canceled and become void in case said board shall select a route for the Siam road which does not touch my said farm; but shall otherwise remain in full force and effect, and shall be payable upon demand after said road has been graded, and before it is macadamized, if requested by said board; upon said board agreeing to later macadamize said road. For the payment of this obligation, I waive my homestead and all other exceptions.

"[Signed] A. L. OSBORNE."

Followed by: "We the undersigned hereby become sureties on the above note and guarantee payment in accordance with the conditions of the same in the event the said A. L. Osborne shall make default.

"J. H. OSBORNE.

F. H. MILLER."

The road was built by way of the complainant's property. The commissioners complied with their part of the contract, and when they demanded payment of the complainant of his note he refused, and the suit enjoined by this proceeding was instituted to collect it.

Unquestionably the act of the legislature afforded to the road commissioners some discretion to make changes in the location of the road which did not change the general course of the road, but they were without power to change the specific locations fixed by the act; for example, the road, according to the act, was to begin at Siam Station— the commissioners could not begin the road elsewhere. The act required the road to run through the Neck country— the commissioners were obliged to give the road that direction. The road was to run by the way of R. B. Hyder's residence to Doe river—they had no authority to run it so as not to go by the way of Hyder's residence, and when they undertook to take it one-half mile or more away, down by the complainant's land, they violated the specific directions of this act. They could not fail to go by the way of Toncray's spring, nor did they have discretion to go elsewhere with the road than to the courthouse at Elizabethton.

When it was determined to change the direction of the road so as not to go by Hyder's place, Mr. Hyder, as he had the right to do, raised a complaint, and in order to satisfy him the commissioners built a spur running from the main road up to his place. It appears to have been a common practice with people living in different communities, when it was understood that the commissioners were exercising their discretion in the location of a road, to contribute to the road fund in order to induce the commissioners to bring the road by their property. The court of civil appeals found that the record disclosed that other people along the route of these roads paid money into the hands of the commissioners for use in the construction work. Some were trying to pull the road one way and some another. The commissioners say that they were not influenced by these contributions of funds in the location of the road, but that they built it along the route deemed most feasible. The court entertains no doubt of the good faith of the commissioners, but as a matter of fact this particular road was diverted from the route fixed by the Legislature in order to accommodate the complainant, who was paying $500 into the road fund. The legislature had by its act intended to serve the public along a different route. Whatever motives inspired the commissioners, and however sound their judgment as to the best location of the road may have been, it was not the road authorized by the legislature, and no discretion had been given them which would enable them to avoid the specific points called for in the act. The commissioners having no power to build the

road along the route they were induced to build it by the contribution of the complainant, all transactions entering into this violation of the act were *ultra vires* and void, and this illegality enters into the note and renders its collection unenforceable. These road commissioners were under no obligation to carry out the contract made with the complainant; they were not bound by it because it was a violation of the act of the legislature, and in order for one party to be bound, both parties must be bound.

Even assuming that the commissioners were not violating the directions of the legislature in routing this road, and that they were given full discretion to construct it by the way of the complainant's land, considerations of public policy will not permit them to have their discretion and judgment influenced by contributions from citizens along the route. The public was entitled to have the unembarrassed and free judgment of the commissioners. The people at large had contributed the funds for the building of the roads. The bonds had been issued upon the belief and faith that the spirit of the law would be complied with in the location of the roads, and it was not expected that the taxpayers should enter into contests for contributions for the determination of the location of the road.

With reference to contracts of this sort, Mr. Pomeroy says (section 935) :

"Contracts made for the purpose of unduly controlling or affecting official conduct of the exercise of legislative, administrative and judicial functions, are plainly opposed to public policy. They strike at the very foundations

of government and intend to destroy that confidence in the integrity and discretion of public action which is essential to the preservation of civilized society. The principle is universal and is applied without any reference to the mere outward form and purpose of the alleged transaction. If a contract does unduly interfere with governmental functions or with relations of the citizen towards his own government in any of its departments, whether the interference be direct or indirect, such agreement is illegal, whatever form it may have assumed."

A contract cannot be purged of its illegality by the fact that the act of the officials was not harmful, nor by the fact that it was done in good faith. It may be that more people were served by the changed location, and that altogether the best thing may have been accomplished in this particular instance, but if public officials are thus left free to violate the law, and become subject to inducements of this character, there is no telling where a thing of this kind might end. If a $500 contribution can influence the commissioners to place the road to the advantage of one citizen, then a $1,000 contribution could influence its location for the benefit of other citizens. Every citizen is entitled to have the road located according to the location fixed by the legislature, if it is fixed, and if its location is left to discretion, then the discretion of the official to whom it is intrusted cannot be made subject to financial influences. It does not help the matter to say that the money paid went into the public fund. If any difference at all, it is worse to corrupt a public fund than an official.

143 Tenn.—23

Let it once be known and established that a board of commissioners will accept contributions to the road fund in determining the location of a road, every selfish interest in the community will at once become encouraged and active, and the tendency is to let the "longest pole knock the persimmon." Such a situation is unthinkable, and cannot be endured by any sound public policy.

Will a court of equity aid the complainant in preventing the consummation of this illegal contract? The road commissioners in this case, according to the proof, were acting in good faith, and with the belief that they had the right and power to do what they did do. It does not appear that they were inspired by any selfish motives. It may be that the complainant himself was acting in equal good faith, but he did have a selfish motive in making this contract. He is conclusively presumed to know that it was illegal and could not be enforced. He had no difficulty in reaching this conclusion when he was called upon to pay the note. He was evidently the leading factor in inducing these public officials to build the road for his benefit in violation of the provisions of the act, and to deviate from those sound principles of public policy which should have governed them.

The court is therefore of the opinion that the maxim of equity, "He who comes into equity must come with clean hands," is applicable to complainant's situation, and that by reason of his participation in the illegal transaction, the court will not lend its aid to him in escaping its consequences.

We do not mean by this that the defendants will be permited to recover on the note in the action at law—we do not pass upon that question. Ordinarily, even where a confession of judgment at law is not exacted, upon granting an injunction in such case, a court of equity will nevertheless, upon dismissal of the bill and dissolution of the injunction, proceed to dispose of the matters involved, and render the judgment which the complainant should have confessed. *Haynes* v. *Bank*, 106 Tenn., 425, 61 S. W., 775.

But to give such direction to this case would be to lend its aid to the defendants for the enforcement of an illegal transaction. Therefore, since no judgment was required, the parties will be left to work out their rights and defenses in the action at law. Complainant's bill will therefore be dismissed at his cost. This is the same result reached by the chancellor and by the court of civil appeals, though upon entirely different grounds.