TENNESSEE-HERMITAGE NATIONAL BANK v. W. P. BRUCE; SAME v. M. W. MOORES.—two cases.

Middle Section.   June 14, 1928.

Petition for Certiorari denied by Supreme Court, April 13, 1929.

E. A. Price and T. W. Schlater, Jr., of Nashville, for appellant, W. P. Bruce.

Roberts, McCarley and Roberts, of Nashville, for appellant, M. W. Moores.

Bass, Berry & Sims, of Nashville, for appellee.

PORTRUM, J. These two causes grew out of the execution of two promissory notes, payable to "Myself," executed by the defendant, Bruce, for $3,000, dated June 14, 1921, and due in three months, and the defendant, Moores, for $1,200, dated April 29, 1920, payable three months after date. The notes were given for the purpose of paying for the capital stock of the Bank of Nashville, at the rate of $130 per share, the par value being

$100. The notes were turned over to a salesman of the bank, who negotiated the $3,000 note to the Hamilton National Bank, of Chattanooga, Tennessee, and the $1200 note to Thomas W. Wrenne & Company, bankers, and the funds derived therefrom were turned over to the Bank of Nashville in payment of the capital stock. These notes were renewed from time to time, until Bruce and Moores secured a loan from the Bank of Nashville upon their promissory notes, to which were attached their certificates of stock as collateral, and with this fund they discharged the notes given to the Hamilton National Bank and to Thomas W. Wrenne & Company.

It is insisted that the minutes of the Bank of Nashville show that Bruce made application for a loan and the loan committee approved this loan. He, therefore, executed his note upon his personal security, and the bank applied the funds in payment of the note to which his stock was attached, and having obtained the stock upon the payment of the note, held it as additional security for its loan. This is plausible, due to the fact that it is the custom of bankers to retain securities passing through their hands for their protection. But the Chancellor, who was sitting in these cases as a jury, found from these facts and the testimony of the defendants that it was the purpose of the bank to loan this money upon the security of its own stock. The conduct of the parties reflects this purpose, and it cannot be said there is no evidence to support this finding.

These notes had not been paid up until the failure of the Bank of Nashville. But before the failure, the bank hypothecated this, with other notes, to the Tennessee Hermitage National Bank to secure its indebtedness to that institution, and the Tennessee Hermitage National Bank brought these suits to collect upon these notes. While the suits were pending, enough of the collateral attached to the debt of the Tennessee Hermitage National Bank was paid to discharge the debt, and these two notes were turned back to the Bank of Nashville, and its receiver, S. S. McConnell, superintendent of banks, intervened as the party complainant in these suits for the purpose of prosecuting them to judgment in order that the proceeds might be applied upon the indebtedness of the bank. It appears that the depositors and creditors have been paid only about thirty-five per cent, and all the funds of the bank will be insufficient to pay the claims in full.

The defenses to the original notes were that the notes were given in payment of the capital stock of the Bank of Nashville and were in violation of law, and void. It was also asserted that the salesman who sold the stock fraudulently misrepresented the facts and agreed with the purchasers that their notes would be

held by the bank and discharged from the dividends declared. They insist that they relied upon this representation. It would not be difficult to sell stock under an agreement of this character, and it is very doubtful if the purchasers were so unsophisticated as to rely upon this representation. But this is not material to the inquiry here for the reason that the Chancellor held the original notes had been paid and discharged by the defendants with knowledge of the fact and that the capital stock was not paid by note but in cash. His holding is that the purchasers of the stock gave their notes, payable to "Myself," to the salesman who negotiated the notes to different banks, and the proceeds were placed to the credit of the Bank of Nashville. These banks then certified to the superintendent of banks that the funds were in their banks to the credit of the Bank of Nashville, when an inquiry was made as to whether or not the capital stock of the Bank of Nashville had been paid in. The Chancellor held that these banks making this certificate, or representation, could not deny the fact that the funds were to the credit of the Bank of Nashville and, therefore, these banks were liable to the Bank of Nashville for the funds, and the capital stock was paid in cash. There is a question as to whether or not the Hamilton National Bank certified the funds were unrevocably subject to the demand of the Bank of Nashville. We do not think this makes any difference for the reason that the certificate of the Hamilton National Bank was made for the purpose of informing the superintendent of banks that the capital stock of the Bank of Nashville had been paid in. No matter how the Hamilton National Bank may have worded the message, the purpose was to make this impression upon the superintendent of banks, and it is sufficient to charge the Hamilton National Bank. The Chancellor held as a fact that $120,000 had been paid in cash upon the capital stock of $100,000 of the bank. We think this holding is amply supported by the evidence.

The Chancellor, however, held that the notes sued upon were taken by the Bank of Nashville for funds loaned the makers, upon the security of the capital stock belonging to the borrowers. He held that this was in violation of the statute prohibiting the officers of a bank loaning money upon the credit of the bank's capital stock and, further, that the contract, being in violation of a statute, was void and non-enforceable. But he was of the opinion that since Bruce and Moores had received the amount of their notes in the funds of the bank, therefore, it was entitled to recover, as a matter of equity, as of money had and received. He granted a judgment in favor of the complainant and against the defendants for the face of their notes, and the defendants have prosecuted an appeal to this court, alleging as error the act of the Chancellor

in granting a recovery for money had and received upon the bill which prayed a judgment upon the notes. It is claimed that this is an inconsistent relief, and also that it is not such relief as can be granted under the general prayer of the bill. The complainant, the superintendent of banks, prayed and was granted an appeal to this court, and assigned as error the action of the Chancellor in holding that the notes were in fact given upon the faith of the collateral security, which was the capital stock of the bank, and, second, if the notes were in fact based upon the faith of the collateral, then the Chancellor erred in holding the contract was void, for the reason that the statute was made for the protection of the depositors of the bank, and not for persons securing funds in violation of the statute.

A jury was demanded in these cases and waived, so, if there is any evidence to support the holding of the Chancellor, the questions of fact as found by him must be sustained. In the statement we have held that there is evidence to support the finding of fact, so there remains only a question of law. It will not be necessary for us to determine whether or not the bill is broad enough to carry the relief granted by the Chancellor, if we conclude at the outset, the Chancellor was in error in refusing a recovery to the complainants, notwithstanding the statute in question had been violated.

The sections of the act which the Chancellor held pertinent read as fellows:

Section 3235, Shannon's Code: "No bank shall buy in, hold, nor cancel its own stock; but may receive it in payment of bad and doubtful debts, or for the purchase of real estate; in such case, the stock shall be conveyed to a third party, in trust, to be sold by him for the benefit of such bank."

Section 3235a90, Shannon's Code: "No bank, person, firm, or corporation doing a banking business shall make any loan or discount on the security of the shares of its own capital stock, nor be the purchaser or holder of any such shares, unless such security or purchase shall be necessary to prevent loss upon a debt previously contracted in good faith, and the stock so purchased or acquired shall, within six months from the time of its purchase, be sold or disposed of at public or private sale."

Subsection 3 of Section 3273a108 makes it a misdemeanor for a director to vote certain things which will impair the capital or be detrimental to the bank, and provides a fine or imprisonment as follows:

"To discount or receive any note or other evidence of debt in payment of capital stock required to be paid or with intention to provide the means of making such payment."

The Chancellor then refers to Section 6437, of Shannon's Code, which reads as follows:

"When the performance of any act is prohibited by statute and no penalty for the violation of such statute is imposed, the doing of such act is a misdemeanor."

The Chancellor held that these statutes had been violated, and he announces the law as follows, which, in our opinion, is the general rule:

"It is familiar law, both in England and America, that a contract prohibited expressly or impliedly by statute is illegal and cannot be enforced. The general rule is that no action or suit can be maintained in equity upon a contract which violates a statute, and it matters not whether the illegality appear upon the face of the contract or from the proof in the case, nor what may be the form of the contract; its effect is to annul and dissolve the contract so far as relates to any remedy upon it. If the contract is in violation of public policy, as declared by the statute law, the courts are mainly governed by the consideration of what is due to public policy and what would be most likely to promote and further it. If the parties be in pari delicto and the contract be executory, courts of equity will order any money that they paid upon it to be refunded, proceeding upon the ground that public policy will be furthered by ordering the money received refunded. Darnell-Love Lumber Co. v. Wiggs, 144 Tenn., 130 S. W., 391; Stevenson v. Ewing, 87 Tenn. (3 Pickel), 380, 9 S. W., 230; Parks v. McKamy, 40 Tenn. (3 Head), 279; Ohio Life Insurance Co. v. Guardians Insurance Co., 30 Tenn. (11 Humph.), 10; Civil Service Inv. Assn. v. Thomas, 138 Tenn., 77, 195 S. W., 775; Whaley v. King, 141 Tenn., 1, 206 S. W., 31."

Contracts in violation of law, which are held to be in contravention of public policy, are declared void and unenforceable by the courts, such contracts as wagering contracts; contracts executed by foreign corporations which have failed to domesticate; contracts in violation of the bulk sales law; contracts in compromise of crime, or to suppress a charge of an assault and battery; and a contract by a public official governing his official acts. Osborn v. Allen, 143 Tenn., 343, 226 S. W., 221; Howell v. Howell, 142 Tenn., 31, 215 S. W., 278; Cain v. So. Express Co., 60 Tenn., 315; Cantrell v. Ring, 125 Tenn., 472, 145 S. W., 166; Howarth v. Montgomery, 91 Tenn., 16, 18 S. W., 399; Ins. Co. v. Kennedy, 96 Tenn. 714, 36 S. W., 709; Watterson v. Nashville, 106 Tenn., 410, 61 S. W., 782; Harton v. Lyons, 97 Tenn., 196, 36 S. W., 851.

But there is a well recognized exception to the general rule, or the general rule does not apply to certain contracts when it would be unwise, or against public policy, to avoid them. This doctrine

is enunciated in the case of Biggs v. Reliance Life Insurance Co., 137 Tenn., 603, 195 S. W., 174, and reaffirmed in Western Union Telegraph Company v. Ausbrooks, 148 Tenn., 623, 157 S. W., 858, and referred to in Eastern Products Corporation v. Tennessee Coal, Iron & Railway Company, 151 Tenn., 256, 269 S. W., 4.

The court, in the Biggs case, supra, said:

"The general rule, broadly stated, is that a contract explicitly prohibited by statute is void, and that a prohibition may be implied from the fact that a penalty is prescribed. But the rule is not an inflexible one, and mere imposition of a penalty does not, of necessity, or in all circumstances, mean that a contract in contravention of the statute is so far void as to be unenforceable by any one a party to it. The courts, the statute not in terms denouncing the contract as void, may look to the indicia above referred to and gather a more limited legislative purpose, especially where it is not necessary to declare the contract absolutely void in order to accomplish the legislative design."

And it is said further in the opinion:

"In arriving at the effect of the statute (Section 3312) on the validity of the policy contract, there is open for consideration the object and reach of the statute, its subject-matter, the mischiefs aimed to be corrected, the class of persons sought to be controlled, and whether the legislative intention will be subserved by holding the policy contract valid or invalid." Biggs v. Reliance Life Insurance Company, 137 Tenn., 603, 195 S. W., 174.

This rule is recognized generally.

"But in determining what a valid, if not a forbidden, contract is, it is often important to consider how far and for what reason the prohibited transaction is wrongful, since the courts will endeavor so to deal with the transaction as to give effect to the fundamental purpose of the legislature and to a wise public policy." Williston on Contracts, Vol. 3, Section 1764.

To apply this rule, it is pertinent to determine the purpose of the legislature in passing these statutes. We are of the opinion that the statutes were made for the protection of depositors and creditors and, therefore, to declare void a note given by a stockholder would defeat the purpose of this act. It would likewise open a door to permit the officers and stockholders of a failing institution to secure to themselves the funds of the institution, with fear of no punishment except that meted out to misdemeanants.

The banking act provides for bank inspectors, and we believe it is the bank inspector's duty to collect and enforce notes which banks have loaned to their stockholders on the security of their stock. We are of the opinion that the penalty for the violation of

this act, in addition to a misdemeanor, is personal liability to the bank by officers who approve the transaction. To say that the notes in question are void undermines the security the act attempts to provide, and public policy demands the enforcement of these transactions.

"In a few cases it has been considered that a bank cannot recover on a loan which it was not authorized to make; but the great weight of modern authority is to the effect that, even though a loan was not authorized, courts will not refuse to lend their aid to the bank to compel the debtor to pay, but will punish the offending bank in some other manner." Banks and Banking, 7 C. J., Sec. 449, page 713. See also Contracts, 6 Ruling Case Law, page 703.

Our court has recognized this rule in the case of Moses v. Ocoee Bank, 1 Lea, 398.

We are of the opinion that the Chancellor committed error in these two cases in refusing a recovery to the superintendent of banks upon the two notes in question for the principal, interest and attorney's fees. His decree is, therefore, reversed and a decree will be entered in this court for said sums, together with the costs of these proceedings. For convenience, the court has written one opinion for the two cases, a copy of the opinion will be attached to each case, but judgments will be entered in the respective cases for the amounts shown to be due, and for the costs of each case.

## APPENDED OPINION.

An application was filed with the court by counsel representing the receiver for the Bank of Nashville to fix reasonable attorney's fees in the two causes. It is made to appear from the notes sued upon that they contained a provision for reasonable attorney's fees, and it is now insisted in view of the work involved that in the Bruce case, which involved $4178.72, a fee of $1000 would be reasonable and in the Moores case, which involved $1572.64, a fee of $250 would be reasonable.

In construing this contract for reasonable attorney's fees, it must be construed in the light of the parties at the time of the execution of the contract which was that the payee was acting in entire good faith, and in this view, the ordinary ten per cent would be a reasonable attorney's fee, for had the parties acted in good faith, then the work necessary for the collection of the note would not have been great. Now, are we to penalize the defendant for the bad conduct of the payee, for the Chancellor found that the payee made material misrepresentations and it was around these representations that the controversial issues waged. We do not think the defendant should be penalized under the facts of this

lawsuit and but for the misrepresentations the notes could have been collected at a cost of not more than ten per cent. For these reasons additional judgments against the defendants are granted, to the amount of ten per cent of the recovery as attorney's fees.

The fees requested appear not to be unreasonable and in the absence of an agreement between counsel and their client, the receiver of the Bank of Nashville, a fee of $1000 in the Bruce case and a fee of $250 in the Moores case will be allowed. The ten per cent recovery against the defendants will be credited upon these allowances and the balance will be paid by the receiver, provided there be no contract agreement between the receiver and his counsel.

An order may be entered accordingly.

Snodgrass and Thompson, JJ., concur.