EASTERN PRODUCTS CORPORATIONS *et al.* *v.* TENNESSEE COAL, IRON & R. Co.*

(*Nashville.*   December Term, 1924.)

1. **SALES.** Contract providing for payment on thirty days' credit or on sight draft against bill of lading at seller's option held not incomplete.

 A contract of purchase is not rendered incomplete by a reservation to the seller of the right only to demand settlement upon delivery in one of two alternative forms on thirty days' credit or on sight draft against bill of lading. (*Post, pp.* 252, 253.)

2. **CORPORATIONS.** Executory contract not enforced at instance of corporation where indebtedness created thereby largely exceeded paid-in capital.

 Where only a small proportion of the authorized capital stock has been subscribed, and the indebtedness created by the corporation's contract largely exceeds paid-in capital stock, and the contract at time of corporation's suit thereon is purely executory, court will refuse to enforce it in harmony with statutory provisions and sound public policy. (*Post, pp.* 253, 254.)

3. **CORPORATIONS.** Executory contract for future delivery of pig iron for $485,000 will not be enforced when only $800 has been subscribed of $2,000,000 capitalization.

 In harmony with implied statutory requirements and sound public policy, the court will not enforce executory contract for future delivery of pig iron, fluctuating in value for a consideration of $485,000 at suit of assignee of corporation organized under Act of 1875, chapter 142, with capital of $2,000,000 fixed in its charter as required by law, when only $800 thereof has been bindingly subscribed, since such contract, though not void, is impliedly prohibited by statutes and public policy. (*Post, pp.* 253, 254.)

*On liability of directors of corporation for permitting business before capital stock is all subscribed, see note in 35 L. R. A. (N. S.), 453.

Eastern Products Corp. v. Tenn. Coal, Iron & R. Co

Cases cited and approved: M. & O. Ry. Co. v. Yandal, 37 Tenn., 294; Memphis v. Gayoso Gas Co., 56 Tenn., 542; Bates Co. v. Winters, 112 U. S., 325.

4. CORPORATIONS. Stock subscriptions not enforceable until fixed capital is subscribed.

Subscriptions to capital stock may not be enforced against subscribers when less than the fixed corporate capital has been subscribed, unless expressly or by implication this condition has been waived. (Post, pp. 254, 255.)

Cases cited and approved: Anderson v. Railroad, 91 Tenn., 44-48; Read v. Memphis Gas Co., 56 Tenn., 545; Heiskell v. Morris, 135 Tenn., 243; Pope v. Trust Co., 118 Tenn., 519.

5. CORPORATIONS. Subscriptions may be limited by by-law.

Subscriptions to the capital stock may be limited by initial by-law provisions or action of directors so as to render subscriptions taken in excess of the limit so fixed not binding. (Post, p. 255.)

Case cited and approved: Lexington, etc., R. Co. v. Chandler, 13 Metc. (Mass.), 311.

6. CORPORATIONS. Only legally enforceable subscriptions considered in determining proportion of capitalization subscribed within rule that stock must be fully subscribed before corporation may proceed to engage in general business.

Only binding and legally enforceable subscriptions may be considered in determining what proportion of the capitalization fixed in the charter has been subscribed in compliance with the rule that capital stock so fixed must be first fully subscribed before the corporation is authorized to proceed with the general business for which it has been organized. (Post, p. 255.)

7. CONTRACTS. Impliedly prohibited by statute or public policy will not be enforced.

Courts will not lend their aid to enforce contracts which are impliedly prohibited either by statute or public policy. (Post, pp. 256-259.)

Cases cited and approved: Biggs v. Reliance Ins. Co., 137 Tenn., 602; Detroit, etc., Ry. Co. v. Detroit, 125 Mich., 673.

Eastern Products Corp. v. Tenn. Coal, Iron & R. Co.

Case cited and distinguished: Singer Mfg. Co. v. Draper, 103 Tenn., 265.

8. **CORPORATIONS.** Seller not estopped to defend action for breach of executory contract to sell to corporation on ground that stock had not been subscribed when contract was entered into.

Seller who had entered into an executory contract for delivery of goods to corporation was not estopped to defend on ground that the stock of the corporation had not been subscribed at time contract was entered into; such defense not constituting a collateral attack on the corporation, under Shannon's Code, Section 2026, 2063, 2064. (*Post, pp.* 259, 260.)

9. **CORPORATIONS.** Public policy and statutory provisions forbid general business without subscribed stock.

It is inconsistent with statutory requirements in Tennessee and contrary to sound public policy for a corporation with a capital stock fixed in its charter to proceed with the general business for which it has been formed and incur obligations without having procured subscriptions to its capital stock. (*Post, pp.* 259, 260.)

10. **CORPORATIONS.** Statutes against collateral attack construed.

Shannon's Code, sections 2026, 2063, 2064, providing against collateral attack on corporations, is limited to defenses denying the validity of the charter or legality of the corporation, a right reserved exclusively to the sovereign, and do not apply to question whether legally existing corporation is precluded from engaging in business because of noncompliance with certain requirements. (*Post, pp.* 260-266.)

Cases cited and approved: Chapman v. Colby, 47 Mich., 46; Pope v. Trust Co., 118 Tenn., 516; Railroad v. Rainey, 47 Tenn., 431; Merriman v. Magiveny, 59 Tenn., 494; State v. McConnell, 71 Tenn., 332; State, for use, v. Butler, 83 Tenn., 104.

Cases cited and distinguished: W. L. Wells Co. v. Gastonia Cotton Mfg. Co., 198 U. S., 177; Lehman, Durr & Co. v. Warner, 61 Ala., 467.

11. **CORPORATIONS.** Courts may refuse to enforce contracts of lawfully created corporations for failure to provide sufficient capital as basis

151 Tenn.—16.

for credit essential to performance of corporation's obligations under contract.

Courts may refuse to enforce executory corporate contracts which plainly demand due provision of capitalization as a basis of credit essential to performance on corporation's part of obligations incurred in substitution for that personal liability from which its members are protected, notwithstanding lawful creation and existence of corporation and its general power to contract. (*Post, pp.* 266-269.)

12. **CORPORATIONS.** Contract in excess of corporate powers may be enforced, where executed by one party.

Where a corporation has exceeded its corporate powers, or has proceeded in violation of some statutory limitation or requirement, the courts will oftentimes lend their aid to the enforcement of its contracts, when they have been executed by one party and justice so demands. (*Post, pp.* 266-269.)

Case cited and distinguished: Perkins v. Sanders, 56 Miss., 733.

13. **CORPORATIONS.** Capital in form of stock at basis of corporate protection from individual liability.

Capital in the form of stock as a substitute for personal and individual liability is a fundamental conception at the basis of the corporate cover from such liability. (*Post, pp.* 269-286.)

14. **CORPORATIONS.** Not authorized to do general business until general provision for credit has been made by obtaining subscriptions to stock as subtitute for individual liability.

Unless otherwise provided by the constating instruments, a corporation with a capital stock fixed in its charter is not authorized to proceed with the general business for which it has been organized, involving the creation of mutual obligations, until it has made provision for credit by the obtaining of subscriptions to its capital stock, as a substitute for that individual liability from which its incorporators are protected by the charter cloak. (*Post, pp.* 269-286.

15. **CORPORATIONS.** Court may refuse enforcement of obligations in excess of paid-in capital.

Obligations created in excess of paid-in capital for which directors are made individually liable under Shannon's Code, section 2350, though not void, may be unenforceable, on ground that they have been entered into in violation of the spirit if not the letter of the law in breach of trust and have been illegally contracted, especially when contract is executory and rights of innocent parties are not involved. (*Post, pp.* 269-286.)

Cases cited and approved: Railroad v. Parks, 86 Tenn., 560; Sweeney v. Railroad, 118 Tenn., 314; Morrow v. Iron & Steel Co., 87 Tenn., 262; Aspen, etc., Co. v. Aspen, 5 Colo. App., 12; Livesey v. Omaha Hotel, 5 Neb., 50; Masonic Temple v. Channell, 43 Minn., 353; Morawetz and R. R. Co. v. Wellington, 113 Mass., 79; Peoria & R. I. R. R. Co. v. Preston, 35 Iowa, 115; Naugatuck Water Co. v. Nichols, 58 Conn., 403; Allman v. Havanna, etc., R. Co., 88 Ill., 521; Minor v. Mech. Bank, 1 Pet., 46; In re Imperial Steam & Household Coal Co., 37 L. J. Ch., 517; City Hotel Co. v. Dickinson, 6 Gray (Mass.), 586; Cotton Mills v. Abbott, 9 Cush. (Mass.), 423; Johnson v. Kessler, 76 Iowa, 411; Fayetteville, etc., Ry. v. Aberdeen, etc., R. R. Co., 142 N. C., 423.

Cases cited and distinguished: Marr v. Bank, 44 Tenn., 478; Sweney Bros. v. Talcott, 85 Iowa, 103; McDermott v. Donegan, 44 Mo., 85; Walton v. Oliver, 49 Kan., 107; Bray v. Farwell, 81 N. Y., 607; Sch. & Sav. Plank-road Co. v. Thatcher, 11 N. Y., 102; Pope v. Trust Co., 118 Tenn., 519; Tradesman Pub. Co. v. Car Wheel Co., 95 Tenn., 655; Stoneham Branch R. Co. v. Gould, 2 Gray (Mass.), 277.

16. CORPORATIONS. Statutes recognize necessity for subscribed stock as essential to exercise of corporate franchise.

Tennessee statutes, providing for and protecting from reduction or diversion the capital stock of corporations, are in harmony with the theory that the existence and maintenance of a fund as a basis of credit derived from a *bona-fide* payment, or at least subscription, of capital stock is a recognized essential to the exercise of the corporate franchise in the incurring of obligations. (*Post, pp.* 286-298.)

GREEN, C. J., dissenting.

Acts cited and construed: Acts 1875, ch. 142, sec. 26.

Eastern Products Corp. v. Tenn. Coal, Iron & R. Co.

Cases cited and approved: Woodward v. Beasley et al., 2 Tenn. Ch. App., 339; Walton v. Oliver, 49 Kan., 107; Nemaha Coal & M. Co. v. Settle, 54 Kan., 424; Whetstone v. Crane Bros. Mfg. Co., 1 Kan. Ct. of App., 320; Aspen Water and Light Co. v. City of Aspen, 5 Colo. Ct. of App., 12; Smith v. Colo. Ins. Co., 14 Fed., 399; Laflin and Rand Powder Co. v. Sinsheimer, 46 Md., 315; Society Perum v. Cleveland, 43 Ohio State, 481; First Nat. Bank v. Alvey, 117 Mass., 476; Whitaker v. Mt. Pleasant Oil Co.,—Tenn.,—; Miller v. Ins. Co., 92 Tenn., 167; Merriman v. Magiveny, 59 Tenn., 494; Moulton v. Connell-Hall-McLester Co., 93 Tenn., 389; Parks v. McKamy, 40 Tenn., 298; Seymour v. Guaranty Asso., etc., 54 Minn., 147; Tenn. Ice Co. v. Raine, 107 Tenn., 158.

Case cited and disapproved: Nat. Bank v. Texas Investment Co., 74 Tex., 421.

Case cited and distinguished: Allison v. Coal Co., 87 Tenn., 62.

Code cited and construed: Sec. 1485 (1858); Secs. 2026, 2064(T.-S.).

*Headnotes 1. Sales, 35 Cyc., p. 48; 2. Corporations, 14 C. J., section 156; 3. Corporations, 14 C. J., section 156. 4. Corporations, 14 C. J., section 809; 5. Corporations, 14 C. J., sections 518, 794; 6. Corporations, 14 C. J., section 155; 7. Contracts, 13 C. J., section 440. 8. Corporations, 14 C. J., section 266; 9. Corporations, 14 C. J., section 155; 10. Corporations, 14 C. J., section 266. 11. Corporations, 14 A. C. J., section 2166; 12. Corporations, 14 A. C. J., section 2169; 13. Corporations, 14 C. J., section 1515 (1926 Anno); 14. Corporations, 14 C. J., section 155. 15 Corporations, 14 A. C. J., section 2166; 16. Corporations, 14 C. J., section 155.

FROM MARION.

Appeal from the Chancery Court of Marion County.— Hon. T. L. Stewart, Chancellor.

Brown & Spurlock, Spears & Spears and Percy, Benners & Burr, for appellants.

LITTLETON & LITTLETON and O'BRIEN, BOARDMAN, PARKER & FOX, for appellee.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

This suit was brought to collect $1,319,100 damages for breach of an executory contract of sale for future delivery of pig iron at a consideration of $485,000. The chancellor found that the assignor of complainant, a Tennessee corporation, at the time of the execution of the contract sued on had but $800 subscribed of a capitalization fixed by its charter at $2,000,000, and was therefore not lawfully authorized to enter bindingly into such a contract, and dismissed the bill.

In March, 1916, a charter was duly granted by the State of Tennessee to Chattanooga Steel Company, as a mining and manufacturing corporation, under the act of 1875; the capital stock being therein fixed at $2,000,000, of which $1,400,000 was common and $600,000 seven per cent. preferred. The incorporators, seven in number, promptly met on March 12th, accepted the charter, and adopted by-laws providing for customary officers and directors, fixing the shares at $100 each, and providing that—"The books of the corporation shall be immediately opened and subscriptions taken and accepted for eight shares of the capital stock of the par value of $100 a share."

A resolution was thereupon adopted reciting that the books were opened at this meeting and that seven subscriptions for one share each were thereupon made and accepted. A meeting of these seven stockholders immediately followed, then the minutes of the incorporators meeting, including the by-laws, were approved, the

directors elected at this meeting instructed to meet upon adjournment to elect officers, and these directors and officers ''authorized to carry on the business for which the corporation was chartered, and to take all steps necessary and incidental thereto.'' This stockholders' meeting thereupon adjourned to March 17th. The meeting of directors elected a president, vice president, and a secretary and treasurer, directed the officers ''to proceed with such business as the corporation might lawfully transact,'' appointed a committee of three to prepare and submit a set of by-laws to the adjourned meeting of stockholders, and thereupon adjourned to March 17th. At this meeting on March 17th the remaining share of stock of the par value of $100 of the eight shares provided by article 5 of the originally adopted by-laws was subscribed for and an amendment to the by-laws was adopted, increasing the number of directors from seven to eight, and the new subscriber was elected to fill the vacancy thus created. This meeting thereupon adjourned to the 21st day of September following. At the meeting of directors on March 17th a second vice president was elected, and adjournment had to September 21st, after the adoption of a motion appointing C. E. James, J. B. Baird, and W. T. James, the president and two vice presidents, ''a committee of three, with power to take charge of the construction of a steel mill and to do all things necessary or incidental thereto.'' It was in this situation of its corporate affairs that the contract sued on was entered into by its president on the 27th day of April, as hereinafter shown.

The adjourned meeting of stockholders was duly held on the 21st of September following, when, after accepting the resignations of two of the directors, a new set of

by-laws was adopted, in which power was expressly conferred upon the president to execute for the corporation all contracts which it might lawfully make, and providing (in lieu of the original by-law provision limiting the taking of subscriptions to eight shares only of the capital stock) that "the full capital stock of the corporation authorized by the charter shall be divided into shares of the par value of $100 each, and shall be sold at par, on such terms and in such manner as the board of directors may from time to time direct." The article of the original by-laws theretofore in force had read as follows:

"The capital stock of the corporation shall be divided into shares of $100 each, and the books of the corporation shall be immediately opened and subscriptions taken and accepted for eight shares of the capital stock of the par value of $100 a share."

It thus appears that for the first time on September 21, 1916 (a) the president was expressly empowered generally to bind the corporation by the execution of contracts in its name, and (b) authority was granted by by-laws, or other action of the stockholders or directors, for the sale of any of the capital stock of the corporation other than the eight shares originally subscribed.

At the adjourned meeting of directors on the 21st of September, after formally accepting the resignations of two of their number, the following resolutions, prefaced by the minute recital herein copied, was adopted:

"And it appearing that there were no other stockholders from which other directors could be elected pursuant to the by-laws (the by-laws requiring a director to

be a stockholder), it was resolved: That *until there should be other subscribers to the stock of the corporation*, from which directors may be elected, the board of directors shall consist of the remaining members of the board, to-wit: [naming them] and *until there shall be such subscribers to the capital stock of the corporation* no other directors shall be elected to fill the vacancies caused by the resignation," etc.

The language italicized appears to have especial significance.

A motion was then passed authorizing the president "to proceed to do all things necessary and incidental to the business and purposes for which the corporation was organized, and to make all contracts and to take all steps looking to the furtherance of the business and purposes for which the corporation was organized, and to report his action to the next regular or special meeting of the board of directors." And finally it appears from the minutes that—"Thereupon it was made to appear to the meeting that said C. E. James, for and on behalf of the corporation, had assumed numerous obligations and taken numerous steps in furtherance of the business for which the corporation was organized, and upon motion duly made, seconded, and unanimously carried all the acts of said C. E. James in the furtherance of the business of the corporation, and of the purposes for which it was organized, were in all things ratified, confirmed, and approved."

The last meeting of this corporation, minutes of which appear on the minute book, filed as Exhibit 1 to the deposition of C. E. James, and which he testifies "contains the minutes of the Chattanooga Steel Company," was

held on the 26th day of September, 1916.  At this spe-
cially called meeting of stockholders the secretary pre-
sented formally a certified list of all stockholders, with
the number of shares held by each, which contains the
name of the seven original subscribers, the incorpora-
tors, and one other, holding one share each.  A formal
waiver of notice was spread of record, and thereupon
the president stated the object of the meeting to be a
review of the minutes of all previous meetings, which,
being read, were upon motion duly approved by formal
resolution.  The minutes of the special or called meeting
of directors are to the same effect, and this exhibit con-
cludes with a formal certificate by the secretary of the
inclusiveness and correctness of the record.  And C. E.
James testifies that this minute book is the "exact rec-
ord of every meeting we held."  Question 273.  Mr.
James elsewhere testifies that one or more meetings were
subsequently had of which no records were preserved
and of which there is no evidence that any action of im-
portance was taken, except that it is shown, although
not on these, the recorded minutes, that the charter of
the Steel Company was formerly surrendered to the
State in December, 1917.  It does not appear that the
corporation ever acquired title to any property, or had
assets, other than the proceeds of the eight shares of
stock, or ever conducted in its name any mining or manu-
facturing or other business operations.  But it appears
from the testimony of Mr. James that he took various
preliminary steps of consequence looking to the prose-
cution of the enterprise contemplated by the charter, pre-
paring a deed from another corporation, of which he was
also president, to this one, covering land on which cer-

tain structural work was or had been done at his instance, final delivery of which was, however, withheld, and entered into contracts, including the one sued on, in considerable amounts, for materials. However, it is shown that the enterprise was finally abandoned, the deed canceled or withdrawn from what might be termed an escrow, and the materials engaged resold by Mr. James, resulting in the establishment or realization of neither assets nor liabilities of Chattanooga Steel Company, the sole claim for or against this corporation outstanding or asserted, as a result of its organization and operations as described, being that now sued on in this cause.

Turning now to the contract made the basis of this suit, it appears that on the 14th day of April, 1916, the following letter was addressed by C. E. James to the defendant company at Birmingham, Ala.:

"April 14, 1916.

"Mr. F. A. Burr, Sales Manager, T. C. I. Co., Birmingham, Ala.—Dear Sir: The Chattanooga Steel Company wants to get thirty thousand tons of standard basic pig iron, shipments to commence in September. That tonnage will be about enough to run us four or five months.

"We had about concluded to give the order to other parties, but thought it might be to our mutual interest if we could place the business with you. Of course, we will be large buyers of this iron continually after we get started and our business will come in handy to any blast furnace operators.

"If you are inclined to give us a low price I will be glad if you will advise me promptly what price you will make. Quotations that you will make will be subject, of

course, to you being thoroughly satisfied with the credit of the Chattanooga Steel Company, and there will be no use for you to take credits up, because if the price is not right we will not place the order. In this connection we want to state the money for the erection of the plant, that is now under construction, is all subscribed. We have no bonds and nearly all the bank officers in Chattanooga are stockholders in the plant.

"Yours very truly,

"CEJ—M                                        C. E. James, Pt."

In response, a sales agent representative of defendant called on Mr. James, and negotiations resulted in the signing by both parties of a sales contract, in common form, fixing the price, quality, and time of delivery. in future in equal installments, accompanied by a letter reserving the question of terms of payment. The total consideration, as before stated, was $485,000, based on a rate of $16.25 per ton, and the first of five monthly deliveries was to be made in October, the sixth month after the signing of the contract.

It appears that when October arrived the iron market was slightly off. No demand was made for the delivery then due, but in November the purchaser agreed to receive the installments due in October and November, the market at that time having stiffened, but no shipments were then or thereafter made. In the spring of 1917 the price of iron advanced rapidly, and finally reached abnormal figures, and, although repeatedly called on to do so, the defendant failed to ship, insisting that the Chattanooga Steel Company had not built a plant as represented in which to use this product. Meanwhile

President James assigned to one Tucker the contract rights of the steel company, and he organized and assigned the contract to the complainant, a New York corporation, formed for the purpose of holding and enforcing this claim, amounting, at the time of the alleged breach, to approximately $1,319,100, and in this situation this suit was brought.

The defenses relied on are thus summarized by counsel for defendant, appellee here:

"(1)    That the Chattanooga Steel Company and the Tennessee Coal, Iron & Railroad Company never made a contract.

"(2)    That, if a contract can be found in the record, misrepresentation on the part of the president of the Chattanooga Steel Company is responsible for it.

"(3)    That, if a contract can be found in the record, the insolvency of the Chattanooga Steel Company from the date of its incorporation justified appellee in not shipping it pig iron, except upon a tender of cash, and no cash was tendered.

"(4)    That the Chattanooga Steel Company was never organized (as distinguished from its status as the result of the filing of the application for its charter and its registration) so as to permit the courts to enforce any contract with it that can be found in the record."

The amount involved is large, the questions important, and learned counsel on both sides have exhibited unusual diligence and ability in presenting their respective contentions.    Without burdening this opinion with an elaborate discussion of defenses 1 and 3 as above set out, we find ourselves unable to sustain them.    The reservation as to terms of payment appears to have done no

more than to reserve to the seller the right to demand settlement in either one of the two alternative forms set forth in the letter of Treasurer Beecher, that is, on thirty days' credit, or "sight draft against bill of lading." And, in view of the conclusion this court has reached, as hereinafter set forth, with respect to defense 4, which is substantially a statement of the ground of the chancellor's decree, we find it unnecessary to pass directly upon defense 2. If the law requires paid or bindingly subscribed stock as a condition precedent to the enforceability by a corporation of its contracts, and the record shows this to be lacking, then the discussion of alleged inducing misrepresentations becomes unnecessary in this case.

We come then to the determinative issue: Will this court enforce an executory contract for future delivery of a commodity fluctuating in value, for a consideration of $485,000, at the suit of a corporate contracting party, chartered in Tennessee under the Acts of 1875, with a capital fixed, in its charter, as required by law, at $2,000,000, if it be shown that but a small proportion of its capital stock had been bindingly subscribed?

A careful consideration of this record is convincing that the facts are as embodied in the foregoing query. A history of the case has been given in the opening paragraphs of this opinion. While there is evidence, of doubtful competency, but to which we have looked, that Mr. James, the promoter of this enterprise, and elected president of the corporation, a gentleman of means and extensive accomplishments, secured, pending the corporate organization, assurances that subscriptions would be made to the capital stock, and himself agreed with

254          TENNESSEE REPORTS.          [151 Tenn.

Eastern Products Corp. v. Tenn. Coal, Iron & R. Co.

others to be a party thereto, in an aggregate sum approximating $500,000 or more, and approximating, also, the amount of the indebtedness arising under the contract sued on, it is apparent that these engagements were conditional, in a manner and to an extent not fully disclosed, and that they were never so fully consummated as to vest in the corporation enforceable rights of action thereon, at the suit of either creditors, or the corporation itself. See 14 C. J., p. 523; also p. 515, pars. 770, 771; Morawetz on Private Corporations, sections 46, 47; *M. & O. Ry. Co.* v. *Yandal,* 5 Sneed, 294; *Memphis* v. *Gayoso Gas Co.,* 9 Heisk., 542; *Bates Co.* v. *Winters,* 112 U. S., 325, 5 S. Ct., 151, 28 L. Ed., 744; Fletcher on Corporations, vol. 2, section 520.

This conclusion is irresistible, not only because of the incompleteness and uncertain character of these subscriptions and the lack of acceptance by or of authority of the board of directors—evidenced by definite inconsistent recitals of the minute records hereinbefore set forth, expressly limiting the stock subscriptions, at the date of this contract and thereafter, to $800, and disclaiming the existence of others—but this conclusion is supported by the well-established rule of law that subscriptions to stock may not be enforced when substantially less than the fixed capital has been subscribed, unless expressly, or by implication, not herein shown, this condition has been waived. *Anderson* v. *Railroad,* 91 Tenn., 44-48, 17 S. W., 803; *Read* v. *Memphis Gas Co.,* 9 Heisk., 545; *Heiskell* v. *Morris,* 135 Tenn., 243, 186 S. W., 99, Ann. Cas., 1918B, 1134; *Pope* v. *Trust Co.,* 118 Tenn., 519, 103 S. W., 792; Morawetz on Corp., sections

156, 137; Beach on Corp., section 535; 16 Am. Cas., 1253; 7 R. C. L., p. 231; 2 Fletcher on Corp., p. 1296.

That the action of the board of directors in closing the subscription books limited the number of shares to be issued, until further action by the board, is held in *Lexington, etc., R. Co.* v. *Chandler,* 13 Metc. (Mass.), 311, cited in 14 C. J., note, p. 393. While in that case a particular statute was construed, the principle is applicable here.

While it appears that Mr. James made some large contracts in the name of the corporation and paid out considerable sums of money on account thereof, which he states were, in effect, payments on account of his subscription to the stock, we do not find from the record as a whole that these transactions were so handled as to commit the corporation unreservedly to the obligations incurred or assure to the corporation the benefits thereof. The investments made by Mr. James in the enterprise appear to have been tentative merely, so far as the corporation was concerned, coupled with an element of reservation to himself personally of the rights and obligations arising, supporting the construction that his subscription was never absolute but conditional and contingent upon more definite assurances of the investment of adequate capital, or other circumstances which remained to be developed.

It will no doubt be conceded that, unless these outside and additional subscriptions reached a status which subjected them to legal enforcement, then they must be disregarded for the purposes of the present discussion. We come then to a consideration of the case as stated in the query above propounded.

It will be observed that we are not dealing with a defense of lack of corporate power presented by a sued corporation, and much of the reasoning based on such a situation of the parties, with respect particularly to questions of estoppel and public policy, is not applicable. The distinction suggested has been recently recognized by this court in *Biggs* v. *Reliance Ins. Co.*, 137 Tenn., 602, 195 S. W., 175, wherein Mr. Justice WILLIAMS quotes approvingly from *Singer Mfg. Co.* v. *Draper*, 103 Tenn., 265, 52 S. W., 879, language having peculiar application to the instant case, as follows, the italics being ours:

"As between the parties the contract is not void, and the *principle which prevents the plaintiff's recovery is that the courts will not lend their aid to enforce contracts* . . . in violation of its laws, and which it has impliedly prohibited.

It will also be noted that this is a contract wholly executory, and many expressions in the authorities emphasize this as a distinguishing element. The courts may feel constrained to enforce contracts wholly or partially executed at the suit of the nonoffending party who has complied therewith, although made by the defendant in violation of lawful requirements, in order to avoid injustice, although constrained to deny relief to the offending party, especially when the contract is executory only, and this may follow, as in the instant case, without questioning the legal organization, entity, or being of the corporation. It would seem wholly unnecessary to burden this opinion with citation of authorities supporting the distinction between the enforceability of executory and executed contracts.

Again, the future delivery feature of this contract is suggestive of the injustice which might result from the enforcement of a contract at the instance of a corporation wholly without means to respond to a demand on account of losses following its default, while its contractee, when the situation is reversed, must do so. The present case presents a startling illustration. If the pig iron contracted for had fallen $10 a ton in the six-months period, the $300,000 claim of the defendant would have been wholly uncollectible; there being nothing in this record sustaining the suggestion that the corporation had either valid subscriptions or other assets which could have been subjected to such an obligation. The market rises, and complainant seeks to recover more than $1,250,000. We do not mean to imply that mere disparity or unequality in resources affords a justification for repudiation of or relief from mutual obligations, upon the happening of future contingencies, but it is proper to consider the consequences which may naturally follow failure to enforce observance of statutory requirements or compliance with the demands of a sound public policy.

This defense is not an attack upon the existence of the corporation, but upon its right to enforce the alleged contract. Its corporate existence is conceded. Distinctions between corporations *de facto* and *de jure* are therefore inapplicable. And the rules denying the right of collateral attack are not questioned or infringed. The general rule undoubtedly is that collateral attack upon the organic entity or existence of a corporation will not be permitted in defense of a suit brought by it. Such collateral attack has been provided against by statute in

Tennessee; but by statute, and generally otherwise, the rule applies only when the corporate creation or existence is sought to be questioned; or, in some jurisdictions, when the doctrine of *ultra vires* or lack of corporate power is involved, but not then to contracts executory only, and never when the lack of right or the wrongdoing of the corporation is the issue, because in violation of public policy or of express or implied statutory requirements, as in the instant case.

Concluding a discussion under the general title "Corporations" of "Matters to which Estoppel Does not Extend," it is said in 14 C. J., p. 243: "And of course an estoppel merely to deny corporate existence," as provided for in the Tennessee statute, "does not extend to matters not involving such a denial," but involving a denial of powers and privileges only. And this same authority (14a C. J., 317) cites many cases for the proposition that—"The general rule is that *ultra vires* transactions, as long as they remain purely executory, are not enforceable, either by an action for specific performance or for damages, and no estoppel can arise to deny their validity."

In the instant case the alleged contract is "executory", as we have seen.

It is said in 7 R. C. L., p. 86, citing *Detroit, etc., Ry. Co.* v. *Detroit*, 125 Mich., 673, 85 N. W., 96, 86 N. W., 809, 84 Am. St. Rep., 589, that corporate franchises are properly classified as, "first the right to organize and exist as a corporation; second, the right to act generally as a corporation; and, third, the special privileges granted to it which are not possessed by the individual under general laws." It is the first class of franchise

which goes with the initial organization and by virtue of which the corporate entity is created—comes into existence. Although an existing corporate entity, *in esse,* the law in this and many other jurisdictions provides for and contemplates the exercise of the powers and privileges embraced within the second and third classifications only upon and after compliance with prescribed conditions; among these requirements being the provision for capital through stock subscriptions as a substitute for personal responsibility. There is, first, the franchise to be, and, second, the franchise to do. By the first existence is created with the attributes of life, but the exercise of contractual and other prerogatives, as with an individual, is restricted and controlled by statutes and public policy. Neither the corporation nor the individual may do certain things without preliminary compliance with lawful requirements nor may act at all wrongfully.

Defenses denying the right of corporate action may be grouped under four heads. It may be contended: (1) That the power of corporate creation is lacking; (2) that some essential condition precedent to creation has not been met; (3) that some condition subsequent to creation, but affecting essentially the power to proceed with the general, or with certain specific, corporate business, is wanting; or (4) that, although the power exists, its exercise has not been rightful because against public policy, without compliance with statutory requirements, or in commission of a crime, or a tort, or a nuisance.

It is against the raising of defenses embraced within 1 and 2 of this group that the doctrine of estoppel against collateral attack applies, and may be invoked in this State by authority of the statute, which is expressive of

the rule generally recognized by the courts, although some of the authorities recognize the right to question the existence of power or authority for the creation of a corporation, as distinguished from irregularities and defects in its creation, where the power to create exists. 14 C. J., p. 246, section 272. However, in the instant case no question is raised as to the power to create, and no question is made as to the regularity of creation. It is not insisted that there has been any failure or that there is any defect in the formation or creation of the corporation. As before stated, its existence is fully conceded. The insistence is that, after its creation as a corporation, it was essential to its right to proceed with its business generally for which it had been organized; that it should provide itself with capital stock as a basis of credit before it should proceed to create obligations for which otherwise it would have made no provision. It seems clear that the doctrine of estoppel against collateral attack has no application when the defenses are confined to matters and conditions falling within (3) and (4) of the group as above classified, as in the instant case.

If it be conceded that our corporation acts and a sound public policy prohibit a corporation with a capital fixed in its charter from engaging in the prosecution of the general business for which it has been chartered and organized—has been brought into existence—until its capital stock has been subscribed, is this a defense which is cut off by specific statutory provisions in this State?

It is provided by section 2026 of Shannon's Code that the doing of the things specified by the statute shall "complete the formation of the company as a body politic, and the validity of the same in any legal proceeding

shall not be collaterally questioned." And by sections 2063 and 2064, brought forward from our Code of 1858, it is provided that, "persons acting as a corporation under the provisions of this chapter, will be presumed to be legally incorporated until the contrary is shown;" and, further, by the second of these sections, that no person sued on a contract made with a corporation shall "be permitted to set up a want of such legal organization in his defense." Construing the language of these sections together, it seems clear that the thing which may not be denied by way of defense is the validity of the charter granted by the State or the legality of the incorporation. This is a question for the State. In other words, by our statutes the exclusive right is reserved to the sovereign which has created the corporation to attack the regularity of its creation. This is recognized as the fundamental basis of that specific phase of the rule of estoppel which cuts off collateral attack upon corporate existence or the regularity of corporate formation or creation. But a questioning of the rightfulness of the exercise by a corporation of powers or privileges is an essentially different matter.

As well expressed by a distinguished former Chief Justice of Alabama, "the extent of corporate power is a very different question from the fact of corporate existence," in the one case, the extent of "power," and, he might well have added, the rightfulness of its use, "affects only the corporation, and the individual contracting with it; and they alone have rights or interests involved. In the other the State has the right, and the only right, to inquire into the legality of corporate existence—to construe its own grant—to determine, if there

is usurpation, whether it will acquiesce in it or resume the power which has been usurped." *Lehman, Durr & Co.* v. *Warner,* 61 Ala., at page 467. In a preceding paragraph that court had said that—"It is also too well settled now to be controverted that a party who contracts with a corporation . . . is estopped from denying the existence of the corporation."

This is the identical rule laid down in our statutes above quoted, which we do not question but approve. The existence of the corporation, or the legality of its incorporation or organization, may not be thus collaterally questioned. It will be observed, however, that the distinction between a denial of the right to exercise certain powers and a denial of the legality of the corporate organization and existence is clearly stated, supra, by Mr. Chief Justice BRICKELL.

So in *Chapman* v. *Colby,* 47 Mich., 46, 10 N. W., 74, the first of several cases cited in 14 C. J., p. 243, in support of its text reading, "and of course an estoppel merely to deny corporate existence does not extend to matters not denying such existence," it is said:

"If the objection rested merely on a failure to prove corporate character, it would have been obviated by the dealings of the parties recognizing it."

That is, Chapman having contracted with it as a corporation, would not have been permitted to attack or deny its corporate character, or existence. But, says the court:

"The question was not whether it was a corporation, but whether it had certain powers or privileges which do not arise necessarily from corporate existence, but

depend on the franchises bestowed on the corporation, which measure its powers.''

It was its franchise to do and not its franchise to be which was involved. And the court held, as applicable to the facts of that case, that ''the power to acquire and hold real estate is not allowed to private corporations except under prescribed conditions,'' and that ''transactions which are in violation of those conditions cannot be maintained. And in general the same principle is extended to prevent them from going into business or doing acts not fairly within the extent of their granted powers.'' In other words, the application of the doctrine of estoppel, generally and under our statute is confined to attacks upon or denial of the legality of the corporate organization or existence, and does not extend to denial of its right to enforce contracts entered into without compliance with express or implied statutory or public policy prohibitions. This distinction, which elsewhere is discussed with more or less, perhaps unnecessary, reiteration in this opinion, is illustrated and sustained by a review of the Tennessee cases cited by the annotator under the above sections of Shannon's Code.

In *Pope* v. *Trust Co.,* 118 Tenn., 516, 517, 103 S. W., 792, the validity of a charter amendment being attacked because not legally authenticated, the court applied this statute and denied the right to set up this want of legal organization in defense.

In *Railroad* v. *Rainey,* 7 Cold., 431, 432, without referring to this statute, the question being, ''Is the La Grange and Memphis Railroad Company a legal entity?'' the court holds that ''the existence of the corporation can never be collaterally'' attacked. *Merriman* v. *Magiveny,*

12 Heisk., 494, we have elsewhere commented on. As stated by the court, the question was: "How far, in a proceeding of this sort, can the court go to inquire into the validity of the supposed charter?" And it was properly held, in harmony with the general rule, and without citation of our statutes, that an individual who had dealt with it as a corporation could not rely upon "irregularities in its organization" in defense.

In *State* v. *McConnell,* 3 Lea, 332, while this statute was not cited, the underlying doctrine of reservation to the State of the exclusive right to attack corporate existence, or raise questions as to the regularity of incorporation, is clearly and concisely stated, "The reason is that the government, having created the corporation for the purposes declared in its charter ought to have a voice in its destruction." But this reason can have no application to a denial by one with whom it has proposed to contract—not of its corporate organization or existence—but of the rightfulness and lawfulness of its conduct as an existing corporation. And, in *State, for use,* v. *Butler,* 15 Lea, 104, the court quotes from section 2063 of Shannon's Code, supra, holds that the state only can forfeit a charter, that third persons may not do so, "but," says the court, "in dealing with such corporations, their powers and obligations may be inquired into"—being the exact distinction herein emphasized.

*W. L. Wells Co.* v. *Gastonia Cotton Mfg. Co.,* 198 U. S., 177, 25 S. Ct., 640, 49 L. Ed., 1003, relied on for appellant, affords an illustration of the distinction we seek to emphasize. The issue in that case was one of federal court jurisdiction. Suit having been brought in North Carolina by the Wells Company, alleging itself to be a

Mississippi corporation, the jurisdiction of the federal court was challenged upon the ground that the plaintiff was not a corporation for the alleged reason that it had failed to pay up $10,000 of the capital stock fixed by its charter, and that this "was a condition precedent to the company's becoming a corporation; that is, it could not become a corporation *de jure* until such subscription and payment." The court of appeals had sustained this contention, holding that this provision was a condition precedent to the corporation's becoming a legal entity, and that therefore the plaintiff was not a Mississippi corporation, and could not therefore maintain its suit as a citizen of another State in the federal courts of North Carolina. Reviewing the case the supreme court reversed the court of appeals, and held, construing the charter issued to the Wells Company, that "it did not require the payment of a given amount of stock subscriptions before the company should be considered *in esse* as a corporation." It did nothing more than confer the privilege, or power, of commencing business when a specified amount, less than the whole, of its authorized capital stock was subscribed and paid for. The court says:

"We are of opinion that the circuit court of appeals erred in holding that the charter of the W. L. Wells Company made it a condition of its becoming a corporation that $10,000, of capital stock should be subscribed and paid for. . . . The question before the court below was whether the company was, technically, a corporation."

The court concedes that—"If the charter of the company had made it a condition precedent to its becoming

a corporation that a certain amount of capital stock should be subscribed and paid for, a compliance with that condition would have been necessary before the company would have become a corporation entitled to sue and be sued in the courts of the United States. But, as we have seen, the charter in question prescribed no such condition.''

This, then, was the question passed upon in that case, not that presented in the instant case, of whether or not the court should enforce an executory contract creating a large obligation before compliance with a requirement which was, in effect, a condition to its incurring such an obligation; namely, the obtaining of subscriptions to its capital stock as a basis of credit and as the necessary means to the prosecution of its general business.

It may be noted, as already suggested, that the textbooks and cases recognize two classes of charters; one in which provisions for capital stock are made conditions of the creation, or coming into existence, of the corporation; and one, such as the charter of the Wells Company and that of the Chattanooga Steel Company, issued in Tennessee, fixing the amount of the capital stock, and by clear implication requiring provision to be made for such capital before the corporation may rightfully proceed to incur contractual obligations.

While the question of estoppel against collateral attack upon the existence of the corporation was not directly discussed in the Wells Co. Case, supra, this was apparently because the jurisdiction of the federal court was in issue, and in this situation the doctrine of estoppel could not be applied; it being necessary in order to sustain the jurisdiction for the plaintiff to affirmatively show

that it was a corporation having legal existence in another State. If the defendant in that case had sought to rely as a defense going to the merits upon an alleged defect in the corporate existence of the plaintiff, the well-recognized doctrine of estoppel against collateral attack might have been invoked. That case is clearly distinguished from the one at bar, in that it is not herein contended that the Chattanooga Steel Company was not a legal entity, an existing corporation, vested by its charter with general powers as such, but that, being such a corporation, it acted prematurely and wrongfully in proceeding with the business enterprise for which it had been chartered and incurring large obligations without having equipped itself so to do in the matter of making provision for the capital stock contemplated and impliedly required by governing statutes and by a sound public policy. Indeed, the defense in the instant case is essentially based upon the theory that the Chattanooga Steel Company was a corporation, *in esse,* with its in- incorporators protected from personal or individual responsibility, and which, nevertheless, had failed to substitute for such responsibility that capital stock which the law contemplates and calls for as a substitute basis for credit.

The Wells Co. Case is further distinguished on its facts from the case at bar in that it was a suit brought to recover for cotton sold to the defendant, and thus a very different situation was presented on the merits. Even where a corporation has exceeded its corporate powers, or has proceeded in violation of some statutory limitation or requirement, the courts will oftentimes lend their aid to the enforcement of its contracts when they have been executed by one party and justice so demands.

Mr. Justice HARLAN, in the Wells Co. Case, quotes from the opinion in the case of *Perkins* v. *Sanders,* 56 Miss., 733, a paragraph in which the distinction between the two classes of charters, hereinbefore referred to, is stated by the Mississippi court. The corporation in the case at bar belongs to that second class of which it is said that—"The corporation is in existence for all the purposes of its creation from the beginning, except so far as there may be restrictions placed on it by the charter, either expressly or by plain implications."

In *Perkins* v. *Sanders,* supra, the right of the corporation to proceed with the making of contracts and incurring of obligations before the capital stock was subscribed was not in issue; the bill in that case having alleged that the stock was subscribed before the execution of the obligation, and the case having been tried on demurrer, which admitted the truth of this allegation. The contention in that case was that the corporation had no power to elect its officers and confer authority upon them, until after the subscription of stock had been made. This insistence the supreme court of Mississippi held to be unsound, holding that the subscription of the prescribed capital stock was "not a condition precedent to the organization of the corporation." The court does not directly pass upon the effect upon its contracts of a failure of the corporation to make provision for its capital, although we understand it to imply that the fixing in the charter of a capital stock constituted a restriction upon the exercise by the corporation of its contract making power.

If an essential to corporate existence has been omitted, and the corporation is for this reason proceeding unlawfully, it is, as suggested by Mr. Justice Harlan in the Wells Case, supra, the province of the state to act. But not so if the corporate creation is complete and the complaint is of a violation of, or noncompliance with, a requirement subsequent to incorporation.

Addressing ourselves more affirmatively to the main issue involved, it must be recognized that a capital in the form of stock, as a substitute for personal, and individual liability, is a fundamental conception at the basis of the corporate cover from such liability. Judge STORY is approvingly quoted in *Marr* v. *Bank,* 4 Cold., 478, as saying that—"The charter relieves them [individual stockholders] from personal responsibility, and substitutes the capital stock in its stead. Credit is universally given to this fund by the public, as the only means of payment."

So Mr. Justice LURTON has strongly impressed the fact that "the capital of stock companies," as contrasted with personal liability, "consists of their stock subscriptions," until, of course, realized upon in cash. "This," says he, "is the basis of credit, and an essential to organization;" that is, as we understand, to that completeness of organization which confers the right to create indebtedness. He proceeds to criticize and condemn conditional subscriptions as unproductive of that financial structure which is requisite and contemplated for the benefit of creditors. The conditional subscription "misleads creditors, and is the fruitful source of litigation and disaster. Tending to the ensnarement of creditors, and contrary to a sound public policy," etc. *Railroad* v. *Parks,* 86 Tenn., 560, 8 S. W., 842. And in *Sweeney* v.

*Railroad,* 118 Tenn., 314, 100 S. W., 732, this court, speaking through Mr. Justice BEARD, quoted approvingly the declaration that the capital stock is the basis of credit and an essential to organization—meaning organization for prosecution of its general business, as distinguishing from the perfecting of its corporate existence. If these statements of Mr. Justice LURTON be true of conditional subscriptions, possibly available as corporate resources, how much more true are they of a practically total want of subscriptions, in the face of a publicly set forth charter capitalization as required by law. And again in a later case this learned jurist refers to "the initiatory or organization stock—that class of stock which is to constitute the capital stock upon which the grant of the franchise depends." And he thus states and emphasizes the essentiality of a subscribed stock as a basis of credit in substitute for person responsibility:

"The theory upon which the State has rendered the acquirement of the franchise *to be a corporation* so speedy and inexpensive *is based upon the assumption that the capital stock which the company holds itself out as having will be in fact paid in,* and will stand as a basis of credit instead of individual liability of those associated in business. To secure a corporate capital which shall be a just substitute for personal liability, the law requires, in explicit terms, that nothing shall be received in payment of the capital stock of a manufacturing corporation but cash, or bonds, or patent rights at a fair and agreed valuation. The charter further prevents the creation of debts beyond the capital stock; it prohibits the lending of money to shareholders or the payment of

dividends in excess of actual profits. The plain and obvious meaning of all these requirements, in the light of the substitution of corporate liability in the place of personal liability beyond the amount of stock subscription, implies that *the organization stock shall be paid up in full at its par value."* (Italics ours.) *Morrow* v. *Iron & Steel Co.,* 87 Tenn., 262, 10 S. W., 495, 3 L. R. A., 37, 10 Am. St. Rep., 658.

Why these detailed and explicit regulations designed to insure the character and protection of the capital stock, if the corporation may conduct its business without providing a capital stock at all?

This reasoning would seem to lead logically to a denial of the right of a corporation, without having made provision for its capital stock, to enforce its contracts involving mutual obligations.

Mr. Morawetz has with exceptional clearness stated many of the fundamental doctrines of corporate law. In volume 1, at paragraph 29, he says:

"If the capital of a corporation is fixed by its charter at a certain sum, this would *prima facie* indicate that the company would have no right to begin to carry on business until the whole amount of capital stock subscribed by the charter has been obtained; the subscription of the whole capital would be a condition precedent to the right of carrying on the corporate business."

In a footnote he aptly remarks that "this rule, of course, has no application where the charter expressly authorizes the company to begin the prosecution of its enterprise before the capital has been fully subscribed," which is not true in this State. And in the following paragraph he draws attention to the distinction between

requirements which impose a condition precedent to the incorporation of the company and ''a condition precedent to the right of carrying on business.'' And, again, at paragraph 137, he says:

''If the capital of the corporation is fixed by its charter at a certain amount, the company has no authority by law to begin the prosecution of its enterprise until the whole amount of the capital has been subscribed.''

It is upon this ground that he bases the conclusion that ''a shareholder cannot be compelled to contribute his proportion of the capital before that time.'' And yet again, at paragraph 408, under the subhead, ''When a Corporation may Begin to Carry on Business. Capital must be Subscribed,'' he discusses more fully this rule, and states the reason of it, and further distinguishes between the formation, or creation, of a corporation and the point at which power is conferred upon it to enter upon the business for which it has been formed and create contractual obligations:

''The subscription of the entire capital stock fixed by the charter of a corporation is not, as a rule, a condition precedent to the formation of a corporate association between those who subscribe for shares. But, in the absence of some provision indicating a contrary intention, the subscription of the entire capital fixed by the charter is always a condition precedent to the right of the company to begin the prosecution of its main enterprise. The object of fixing the capital of a corporation at a definite sum is to indicate the scope of the company's business and the amount of capital deemed necessary for the transaction of the business contemplated. It indicates to shareholders their fractional interests in

the whole concern, and the extent of the enterprise in which they are invited to join. Until the amount of capital fixed by the charter has been subscribed, the right of the company to begin to carry on business remains inchoate, and the agents of the company have no authority to perform any acts except such as are necessary to perfect its organization, and prepare it for the prosecution of its regular business after the capital agreed upon has been obtained. It has for this reason been held, in numerous cases, that the subscribers for shares cannot be compelled to contribute the capital subscribed by them for the purpose of carrying on the company's business, until the amount of capital indicated by the charter has been subscribed.''

Other text-books writers are in harmony with these statements of the general principle involved. Expressions apparently to the contrary, when analyzed, are found to be so based upon peculiar facts, or exceptional statutory provisions, as to relieve them from real conflict.

In Cook on Corp. vol. 1 (8th Ed.), p. 578, under subhead, ''Failure of the Corporation to Obtain Subscriptions to the Extent of the Full Capital Stock,'' after stating the rule that subscription contracts generally are not binding until the full stock capitalization fixed in the charter has been subscribed, and that this condition of liability arises by implication from the just and reasonable understanding of a subscriber that he is to be aided by other subscriptions, it is further said:

''This rule *is supported also by public policy in that corporate creditors have a right to rely upon a belief that*

151 Tenn.—18.

*the full* capital stock of the corporation has been subscribed.'' (Italics ours.)

This text is supported by the citation of authorities. And on page 48 of the same volume it is said that, ''where a stock corporation has received no stock subscription and issued no stock, it cannot maintain a suit,'' citing *Aspen, etc., Co.* v. *Aspen,* 5 Colo. App., 12, 37 P.. 728. This is the only case to which our attention has been called in which an attempt has been made by a corporation which had never received any stock subscriptions to maintain a suit, and we are aware of no reported case in which a corporation in such a situation, or with a subscribed stock in a nominal sum only, has sought the aid of the courts in an attempt to enforce a contract wholly executory.

Again, while recognizing that the subscription of the whole amount of the capital stock is not a condition precedent to the legal existence of the corporation, unless made so by statute, Mr. Elliott, in his work on Private Corporations (3d Ed.), section 354, says: ''If the amount of capital stock of a corporation is named in its charter, it by implication has no authority to begin business until the whole amount of such capital has been subscribed,'' adding the statement that under such circumstances ''the stockholders cannot be required to pay their subscriptions.''

In Machen on Modern Law of Corporations, vol. 1, sections 177, 754, distinction is drawn between the English rule and that prevailing in America, stating that the condition that the entire capital of a company, if fixed by its charter be subscribed before the company has a right to commence business ''has been thought to be im-

plied from the very nature of a corporation having a fixed capital.'' He goes on to say that, while a corporation may begin business by unanimous consent, or in pursuance of a provision in the incorporation paper, before the capital has been completely subscribed, ''it is generally thought that except under such circumstances, a corporation with a fixed limited capital has no right to commence business before all its shares are taken.'' And he adds:

''This doctrine is indeed the basis of the all but universal American rule prohibiting any calls upon shareholders before the authorized capital is fully taken.''

The pertinency of the decisions dealing with the liability of subscribers is thus made to appear. In section 754 Mr. Machen repeats and reaffirms these principles, saying, among other things on this subject:

''On the other hand, except for preliminary expenses, a corporation can have no need of capital until it is competent to commence business. . . . We have seen above that according to the American rule a corporation may not commence business unless by unanimous consent until its authorized capital has been fully subscribed.''

He elsewhere notes the exceptions applicable to cases in which the charter, or statute, expressly authorizes the company to begin business when an amount less than its fixed capital has been subscribed. Among other authorities cited by Mr. Machen is *Livesey* v. *Omaha Hotel*, 5 Neb., 50, in which the court expressly states in the course of its opinion that, while all necessary preliminary steps may be taken in perfecting the organization of the company without first having secured a full sub-

scription of the capital stock required by a charter, "all such and similar acts will afford no satisfactory· proof that they intended to proceed with the main design of the corporation, until all the capital stock required shall have been fully secured by subscription to the stock." The court clearly distinguishes between the bringing into being of a corporation, its organization as a legal entity, and its acquiring authority "to proceed with the accomplishment of its main design." So in *Masonic Temple* v. *Channell,* 43 Minn., 353, 45 N. W., 716, which was a stock subscription case, cited by Mr. Machen, the court, recognizing and approving the rule that payment of subscriptions cannot be required until the whole amount of stock has been subscribed, quite pertinently to the issues in the case at bar, says:

"There were solid reasons for the rule—reasons based not only on considerations of public policy, but on the presumed understanding and intention of the subscriber."

*Sweney Bros.* v. *Talcott,* 85 Iowa, 103, 52 N. W., 106, is another case cited by this author which discusses the principles involved. The charter fixed the capital at $3,000, and provided that the company was to commence business at the date of the notice given by a required publication. Construing the charter and Code sections, the court said:

"It is not required, as a condition precedent to complete organization, that all the capital stock authorized shall be taken. It more frequently occurs that subscribers of a portion of the stock form and organize the corporation among themselves, and afterwards place the undisposed-of stock. Such a condition is, however, pre-

cedent to the right to commence business and incur debts, unless it is provided in the articles that the corporation may do so when a specific amount of stock is subscribed.

The court cites *Morawetz and R. R. Co.* v. *Wellington,* 113 Mass., 79. Expressions in *Peoria & R. I. R. R. Co.* v. *Preston,* 35 Iowa, 115, and in many authorities examined, are to the same effect.

In 7 Ruling Case Law, section 205, p. 233, it is said, recognizing a distinction heretofore noted, that—"Organization, unlike the power to do business, does not necessarily contemplate the incurring of debts, nor make available capital a necessity."

It has been expressly declared repeatedly that provisions in the statutes or charter against the commencement of business by the corporation until the capital stock has been paid in, or subscribed, are intended for the benefit of those who might be dealing with the corporation. In *Naugatuck Water Co.* v. *Nichols,* 58 Conn., 403, 20 A., 315, 8 L. R. A., 637, a subscriber for stock sought relief from his subscription on the ground that the corporation had entered into a contract for the construction of its plant before twenty-five per cent. of its capital stock had been paid in, in disregard of a provision in the charter that "twenty-five per cent. of the capital stock shall be paid in before said company can exercise the privilege and powers herein granted." The court held the subscriber bound, and, distinguishing between "organizing contracts" and those entered into after organization, in the exercise of the powers or privileges granted the corporation, incidentally holds that contracts made in the prosecution of its general business,

278	TENNESSEE REPORTS.	[151 Tenn.

Eastern Products Corp. v. Tenn. Coal, Iron & R. Co.

prior to compliance with requirements for a capital stock, are premature and nonenforceable. While two of the learned justices dissented from the conclusion reached by the majority in this case, in so far as the defendant stock subscriber was held liable, it is notable that they all agree that the contract for the construction of the plant was premature and invalid because entered into before the required provision had been made for capital stock. And in *McDermott* v. *Donegan,* 44 Mo., 85, the court recognizes the right of the corporation to formally organize as such, but says:

"But the directors were not authorized to proceed with the contemplated transportation business until $350,000 had actually been paid in. This was for the protection and security of those who might deal with the company."

In *Walton* v. *Oliver,* 49 Kan., 107, 30 P., 172, 33 Am. St. Rep., 355, cited by Mr. Justice NEIL in *Woodward* v. *Beasley et al.,* hereinafter discussed, this significant expression occurs:

"We do not understand that a corporation can proceed to the transaction of business without any portion of its capital stock being subscribed or paid. It may have been the English rule, but in the United States it is otherwise. Boone, Corp., section 113. The corporation has no means or capacity to act until some portion of the capital stock named in the charter has been subscribed and paid."

In *Allman* v. *Havanna, etc., R. Co.,* 88 Ill., 521, cited by Mr. MORAWETZ, it is said in the headnote that a corporation "can do such acts only as are necessary to set the association in motion as a corporation , until the whole number of shares of capital stock fixed in its articles of

association have been subscribed. Until that is done, they cannot make contracts, or incur liabilities," etc. The body of the opinion supports this statement of the rule; finding that "there is nothing in the 'articles' or in the statute which authorizes the corporation to commence operations when a less amount is subscribed." In that case the court goes so far as to hold that the obtaining of subscriptions to the capital stock is a condition precedent to the legal existence of the corporation, to which view we do not subscribe. And in *Bray* v. *Farwell*, 81 N. Y., 607, also cited by Mr. MORAWETZ, in support of his text, it is said:

"It will be seen that there is no provision authorizing the directors to commence the business for which the company was organized until the amount of the capital stock was subscribed for and taken. It was a company with a capital of $3,000,000. . . . That large amount of capital was deemed necessary for the transaction of the business contemplated, and the agreement necessarily implied was that it should be secured as the basis of the business. . . . From the very nature of the case, until all the shares constituting the capital stock were taken, the company remained inchoate, and there was no authority on the part of the directors to prosecute the regular business of the company or incur obligations therein."

In the second edition of Green's Brice's Ultra Vires (page 153 et seq.), generally recognized as a standard work, the English rule is thus stated in the text: "Corporations having the power to raise adequate capital may begin their business before that capital or any portion thereof is obtained," but the American editor, Mr.

Green, recognizes, as do other authorities, that the English rule does not prevail in America, the organization and forms of corporations differing essentially in the two countries, and in his note says:

"The American rule seems to be the reverse of that stated in the text; when the number of shares and the amount of the capital is fixed, the whole stock must be subscribed before the corporation can begin business, unless the constating instruments expressly remove this restriction. This rule does not prevent the corporation from doing preliminary business or from making assessments for preliminary purposes, but the subscription of the whole amount is a condition precedent to laying an assessment for general purposes or entering upon the general business for which the corporation was created."

Supporting cases are cited by the author in this note from Maine, New Hampshire, Massachusetts, New York, Maryland, Georgia, Indiana, Michigan, Iowa, Nebraska, and Oregon. He proceeds as follows:

"PARKER, J., in *Sch. & Sav. Plank-road Co* v. *Thatcher*, 11 N. Y., 102, holds that a 'subscription of the whole amount of stock has never been held a condition precedent to a legal corporate existence, except when it was made so by the act of incorporation.' This must be taken to apply to cases when the corporation comes into existence for organization on certain subscriptions being made less than the whole amount, or when a corporation is created *in presenti*, by naming commissioners to open books for subscriptions. *Minor* v. *Mech. Bank*, 1 Pet., 46, 7 L. Ed., 47. But it is believed that no case can be found in this country where a corporation has been held authorized to commence the business, to carry

on which it is created, before the capital is subscribed, unless by legislative enactment to that effect.''

The learned author then notes that ''an express agreement between a subscriber and a corporation may remove this restriction so far as liability for assessments is concerned,'' but he significantly adds that ''the corporation cannot, by any act alleged to operate by way of waiver or estoppel, relieve the corporation from its obligation to have the capital required by the charter;'' and in this connection it is suggestive, as bearing upon the question of public policy involved, that even in England, in the case of *In re Imperial Steam & Household Coal Co.,* 37 L. J. Ch., 517, MATINS, V. C., ''considered it a fraud for a company to commence business with only one-fifteenth of its nominal capital subscribed.'' Green's Brice's Ultra Vires, p. 156.

As before remarked, cases apparently contra when analyzed are not found to be in fact so. For example, in *City Hotel Co.* v. *Dickinson,* 6 Gray (Mass.), 586, while the corporation was held entitled to recover, it appears that the capital stock had not been fixed, and the court expressly recognized the rule that the subscriber is not bound, as applied in *Atlantic Cotton Mills* v. *Abbott,* 9 Cush. (Mass.), 423, when the capital had been fixed. And in *Johnson* v. *Kessler,* 76 Iowa, 411, 41 N. W., 57, the court distinguishes that case from *Peoria & R. I. Ry. Co.* v. *Preston,* 35 Iowa, 115, holding that, in *Johnson* v. *Kessler,* supra, it had been expressly provided by statute that the corporation might lawfully commence business as soon as its articles of incorporation had been filed, and in *Fayetteville, etc. Ry.* v. *Aberdeen, etc., R. R. Co.,* 142 N. C., 423, 65 S. E., 435, 9 Ann. Cas., 183,

which was an injunction suit brought by one railroad against another, and not a suit by a corporation to enforce a contract, the court found that there was no statutory requirement that the stock should be issued or paid up.

It will be observed that in none of these cases against subscribers in which the defense was relied on that the fixed or required capital stock had not been provided was the doctrine of estoppel against collateral attack invoked. This doctrine would seem to be no more applicable in a case like the one at bar than in a suit against a subscriber. In neither case is the existence of the corporation denied. It is its right to enforce contracts without having secured subscriptions to its capital stock as required by law which is denied in both cases.

The applicability of the numerous authorities in this State, and elsewhere, holding that stock subscriptions, in the absence of waiver, cannot be enforced unless the entire capitalization has been subscribed, is denied by counsel for appellant, but we are constrained to the view that these holdings are pertinent, since it will be observed that they are in large part grounded upon the omission of that provision for a basis of credit in conducting the enterprise which the law contemplates shall be made in the form of capital stock. For instance, after stating that, "if the capital of the corporation is fixed by its charter at a certain amount, the company has no authority by law to begin the transaction of its enterprise until the whole amount of the capital has been subscribed," Mr. Morawetz (paragraph 137) goes on to say that "therefore a shareholder cannot be compelled to contribute his proportion of the capital before that time."

And so Mr. Machen (volume 1, section 589), discussing the liability of subscribers to increases of capital stock, says:

"The reason for holding that a subscriber to shares in the original capital of a corporation is not liable for calls until the entire capital has been subscribed, is that the company is not authorized to commence business, and therefore can have no need of money before its capital is wholly taken."

And in *Pope* v. *Trust Co.*, 118 Tenn., 519, 103 S. W., 795, after stating that "the general principle is settled by the authorities that a subscription to the original stock of a corporation is made upon the condition that the whole amount of the capital stock is taken by *bona-fide* subscribers, and the subscribers will not be compelled to pay until this is done," this court declares that "the reason of the rule is that a corporation should not begin business until the requisite amount of its capital stock is secured by *bona-fide* subscriptions," but that, after the corporation has begun business and is a going concern, the same reason does not apply.

It will be observed that this court in that case recognized and expressly stated the view that—"A corporation should not begin business until the requisite amount of its capital stock is secured by *bona-fide* subscriptions."

In harmony with the general principle that a subscription to the original stock is made upon the condition that the whole amount of the capital stock will be subscribed before subscribers can be compelled to pay, is it not consistent with sound public policy and our statutes to hold that contracts are made by third parties with a newly organized corporation upon the implied condition

that it has secured, or will secure, subscriptions to its capital stock—at least in such amount, if less than that fixed in the charter, as will afford reasonable provision for the performance on its part of the mutual obligations created by the contract?

In *Tradesman Pub. Co.* v. *Car Wheel Co.*, 95 Tenn., at pages 655, 656, 32 S. W., 1103 (31 L. R. A., 593, 49 Am. St. Rep., 943) Mr. Justice McALISTER quotes approvingly from Morawetz on Corp. the statement that—''Every contract entered into by the corporation, therefore, includes . . . an implied representation that the company's capital has been paid in, or subscribed, as indicated by the company's charter.''

As said by Chief Justice SHAW in the leading case of *Stoneham Branch R. Co.* v. *Gould,* 2 Gray (Mass.), 277, of the nonliability of a subscriber until all the capital stock is subscribed:

''This is no arbitrary rule; it is founded on a plain dictate of justice, and the strict principles regulating the obligation of contracts.''

Further emphasizing the distinction already noted to which, perhaps, learned counsel for appellant have not given sufficient recognition, Mr. Morawetz, at paragraph 29, following the emphatic statement that, ''to begin business and incur debts before the whole capital has been subscribed would be an unauthorized exercise of corporate power,'' proceeds to say that ''it does not follow that the subscribers would be unable to form an incorporated association until the whole amount of the shares had been taken,'' but that they ''would have full authority to do all corporate acts necessary to a complete organization of the company, though they would have no right

to carry on its regular business.'' Authorities are cited by the writer sustaining his text.

A review of the applicable statutory history in this State would seem to sustain the insistence that the soundness of such a public policy has been therein recognized. Without going back of the general incorporation act of 1875, it appears therefrom that one of the initial and apparently essential duties to be performed upon the granting of a charter was the fixing by by-laws of the amount of capital to be invested in the enterprise. This evidently contemplated a fixed capitalization as a basis of credit. But by the act of 1897 the legislature went further and expressly required that ''persons applying to the State of Tennessee for any charter of incorporation to be organized for profit shall fix in the charter applied for the amount of the capital stock of the proposed incorporation'' (the word ''authorized, improperly substituted for the words ''capital'' stock in the charter of Chattanooga Steel Corporation, is not contained in the act); and this act was subsequently amended in 1913, chapter 53, by the insertion of a requirement that the capital so fixed ''shall in no case be less than $1,000.'' While the fact that this requirement for the fixing of the capital stock in the charter is a part of a revenue producing act weakens somewhat its force as a declaration of legislative policy, it is consistent with the requirement theretofore in effect for the fixing of the capital stock as an initial incident of complete organization, and it appears from these provisions that it was the intention of the legislature, first, that there should be a fixed capitalization as a basis for credit in the prosecution of the business, and, second, that this capitalization should be

made a matter of public record, and, third, that $1,000 should be the minimum credit basis fixed in any case.

Looking further to our statutes we find that, the capital having been once fixed, no reduction can be made therein, unless the rights of creditors are protected; that payment for stock in mining and manufacturing companies may be made in cash or land only; that books and records must be accurately kept; that annual statements are required, and liability for false statements prescribed —all in harmony with the theory that the existence and maintenance of a fund as a basis of credit derived from a *bona-fide* payment, or at least subscription, of capital stock, is a recognized essential to the exercise of the corporate franchise in the incurring of obligations. And whether or not the statutory provision fastening personal liability upon directors assenting to the creation of indebtedness in excess of the paid-in capital stock is to be so construed as to invalidate contracts creating such excessive obligations, it cannot be doubted that the language and intent of this provision clearly recognizes the necessity for a capital stock in the sense of a fixed asset as a basis of credit.

Passing now to a consideration of the Tennessee decision cited by the chancellor and relied on for the appellee, being *Woodward* v. *Beasley et al.*, 2 Tenn. Ch. App., 339, opinion by Mr. Justice NEIL, afterwards Chief Justice of this court, affirmed by this court in 1902, it appears that the syllabus and the learned and full discussion strongly support the insistence of appellee herein. Counsel for appellant vigorously and ingeniously dispute the force of this opinion as *obiter dicta* only; by an inferior court, affirmed here as to result only; not

unanimous except as to result, and distinguishable on the facts, particularly in that no subscriptions whatever had been in that case made. In other respects learned counsel skillfully analyze and seek to differentiate and thus avoid the force of the language employed. Conceding weight to some of these criticisms, and that the discussion therein particularly pertinent here was not essential to the decision reached, we cannot fail to recognize the force of the reasoning of this learned jurist and its applicability to the facts of the instant case. While in that case no subscriptions had been made, in this the binding subscriptions were so nominal as to be entitled to no controlling consideration. In that case there were charges of actual fraud—but in this it is insisted that the large fixed capitalization was so used as to mislead in fact, which we have found it unnecessary to determine —apart from the representation resulting as a matter of law from the publishing of the figures in the charter as required by the statute. While it is true that the situation of the parties to the suit was different, the very fact that in that case the action was one brought against the corporation, while in this we have a suit brought by the corporation, itself alleged to have failed to comply with essential prerequisites, affords an additional basis for a refusal by this court to enforce the asserted claim of the corporation not therein appearing. If the reasoning was applicable in that case, this reasoning affords all the stronger ground for refusal by this court to lend its aid to enforcement here at the suit of the corporation itself. The following extended excerpts from this opinion of Mr. Justice NEIL are self-evidently applicable:

"When these matters are provided for—that is, the amount of the capital stock fixed and when subscriptions thereto have been made and officers are elected—the corporation is organized, and is ready to be launched upon the business world. Up to this time it could not justly be said that it has the right to enter upon the business for which it was created. There is embraced in the legal conception of a trading corporation, in its fullest sense, not only an organization, and powers given to that organization by law, but also a capital stock. We say in the fullest sense, because we are not unmindful of the rule laid down in this State, and in some other jurisdictions, that a corporation may exist even though all of its shares are owned by one person and it is insolvent or without property. In this latter class of cases are to be found those organizations which have started fully formed, but in course of time have lost most of their attributes, and are left practically only with potential rights, not rights in active exercise in the prosecution of business. These cases need not enter into our consideration in disposing of the present controversy. We repeat, therefore, that the conception of a trading corporation in general, and certainly under our statutes above referred to, includes the idea not only of a board of directors and a corps of officers, but also a capital stock. These things are all expressly provided for in the statutes. The capital stock is a matter of the first importance. Under the law a body of individuals is banded together for a certain purpose with power to carry on business and contract debts, to buy and sell, but without any personal liabilities against the several corporators. In the place of these individuals and of their liability there is put

the legal entity, the corporation. Can it be supposed that it was the intention of the lawmakers that such privileges and such powers—that is, to carry on business, to buy and to sell and to contract debts, without any personal liability for such obligations—can it be supposed that these were conferred upon any body of men without a purpose upon the part of the lawgiver to substitute for the withdrawn personal liability of the corporators the liability of the corporation itself? To ask the question is to insure a negative answer. But if no such purpose could be intended by the makers of our laws in granting the charter above mentioned, how can it be said that the corporation, *in advance of any provision for capital stock, could contract debts?* To say that the corporation at this stage of its existence could contract debts would be to authorize by law the creation by an artificial being of obligations which, in the nature of things, could never be met, and as to which there could be no expectation of payment. No such purpose can be imputed to the law. No construction can be entertained which would lead to such results. The more reasonable construction, indeed, the only reasonable construction as we see. the matter, is, that it was the intention of the legislature that the corporation should, from the date of the registration of the charter in the manner stated, be a legal entity, but that it should take the preparatory steps above referred to before entering upon the business for which it was organized.

"It is no answer to the foregoing reasoning to say that without a capital stock the corporation could buy land or personal property, sell it for a profit and pay

151 Tenn.—19.

its debts. Of course it is not at all impossible that a corporation without a capital stock, through its officers, if it should be allowed to purchase real or personal property, might resell that property and repay the debt contracted. But this is beside the question. The real legal point at issue is whether, under a true construction of the statute, such transactions could or ought to be allowed. To our minds it is most clear that the permission of such a course of conduct would be contrary to a sound public policy, and that no court ought to find such permission in an act of the legislature unless that permission be given in plain, unmistakable terms, and even then we seriously doubt whether such a provision would be constitutional. But we need not go into this latter question.

"The views which we have above announced are sustained by the weight of authority. *Walton* v. *Oliver*, 49 Kan., 107; *Nemaha Coal & M. Co.* v. *Settle*, 54 Kan., 424; *Whetstone* v. *Crane Bros. Mfg. Co.*, 1 Kan. Court of Appeals, 320, 325, et seq.; *Aspen Water and Light Co.* v. *City of Aspen*, 5 Colo. Court of Appeals, 12; *Smith* v. *Colo. Insurance Co.*, 14 Fed., 399. See also Morawetz Corp. Vol. 1, secs. 33, 408, 409; Thomp. Corp., secs. 2969, 2989, 4133.

"An opposing case is *National Bank* v. *Texas Investment Co.*, 74 Tex., 421, 435, 436; citing *Laflin and Rand Powder Co.* v. *Sinsheimer*, 46 Md., 315; *Society Perum* v. *Cleveland*, 43 Ohio State, 481; *First National Bank* v *Alvey*, 117 Mass., 476. The Texas case gives no reason for the rule it adopts except in so far as the reason may be found in the cases cited. Turning to the first two of these cases, we find that the decisions therein were

based upon the proposition that the existence of a corporation could not be collaterally questioned by one who had dealt with it. The third case is based partly upon this principle and partly upon the statutes of Massachusetts with reference to the court in which personal liability of the corporators could be enforced. These decisions are not really opposed in principle to the views we have above announced. *Under these views we do not question the existence of the corporation, but admit its existence,* denying that upon the face of the charter or the act which authorized the charter, properly construed, a *debt could be contracted lawfully until after a provision for the capital stock and the subscription thereof."* (Italics are ours.)

Learned counsel for appellant rely upon the unreported opinion of Special Justice SMITH in *Whitaker* v. *Mt. Pleasant Oil Co.*, decided at Nashville in 1922, but without further distinguishing that case it may be said that it was a suit in which the defense was interposed by the corporation which itself had been guilty of the noncompliance with the legal requirements relied on. For this reason, if not for others, that decision is not controlling here. However, the opinion in that case, rightly decided on its facts, referring to *Woodward* v. *Beasley,* supra, expressly disclaims undertaking to say "that any principle announced in that case is unsound when applied to the facts of that case," and proceeds to distinguish rather than disapprove it.

We have made an examination of other authorities cited by diligent counsel in great number, but have found nothing therein which, properly distinguished, is in substantial conflict with the conclusions we have reached

herein. In some of these the contracts had been executed, in others the delinquent corporation was seeking affirmative relief from its own unauthorized contract or relying on the defects alleged as a ground of repudiation.

For example, expressions of this court in *Miller* v. *Ins. Co.*, 92 Tenn., 167, 21 S. W., 39, 20 L. R. A., 765, are relied on. That was a case in which the corporation sought to defend an action to recover on an insurance contract on the ground that the contract was beyond its charter powers. The court held it estopped by conduct which affirmatively indicated its adoption of the essential amendment to its charter enacted by the legislature after issuance of the charter. In the present case the situation of the parties is reversed, and the holding in that case does not control here. The expression quoted from the opinion of Mr. Justice LURTON was by him quoted and approved in an incidental discussion of the doctrine of *ultra vires*. That doctrine is not involved here. Another Tennessee case relied on is *Merriman* v. *Magiveny*, 12 Heisk., 494, which holds to the general rule that a defendant to a suit by a *de facto* corporation may not defend by collateral attack upon the legality of the corporate organization. This is not the issue here. The corporate existence, as before stated, is not questioned. The defense of illegality or invalidity of a contract because contrary to some statute, or made without compliance with some legal requirement, such as is presented in this case, is, in given cases, of a class available alike against an individual or a partnership. The point is not necessarily that the complainant is or is not a corporation so much as that, being a corporation, it has failed to comply with legal prerequisites to recovery

upon the contract it seeks here to enforce. If it were a foreign corporation and had failed to file its charter, or if the contract came within the Blue Sky Law and it had failed to comply, or the contract involved the exercise of a privilege and the tax was unpaid, in none of these cases could complainant recover.

As before suggested, the case before us is not one of a corporation seeking to shield itself behind omissions or defects of which it has itself been guilty. It is here seeking to enforce a contract which it has failed to equip itself to perform on its part by noncompliance with prerequisites contemplated by the legislative acts creating it and called for by sound principles of public policy. Conceding its lawful creation and existence as a corporation, and its general power to contract, it does not follow that the courts will lend it their aid in the enforcement of executory contracts which plainly demand due provision of a capitalization as a basis of credit essential to performance on its part of the obligations incurred in substitution for that personal liability from which its members are protected by its charter.

The suggestion of compensating liability on the part of its directors assenting to this indebtedness in excess of the paid-in capital stock does not meet the case. This is a remedy secondary, contingent, and uncertain, on which one of the directly contracting parties may not rightfully force the other to rely, and it may be here remarked that on the present record it does not appear that that the directors, other than possibly Mr. James, so assented to the creation of this indebtedness as to render them liable; the minutes do not show that it was authorized by them; and expressions of this court are num-

erous sustaining the view that the creation of obligations in excess of the paid-in capital, while not rendering the obligation void, is to be condemned as an improper exercise of the powers conferred. Indeed, the courts may well refuse to enforce contracts calling for such excessive obligations at the suit of the offending corporation, certainly when executory only—the rights of innocent parties not being involved—upon the ground that in this respect they have been entered into in violation of the spirit if not the letter of the law, in breach of a trust, and have been "illegally contracted." In *Allison* v. *Coal Co.*, 87 Tenn., at page 62, 9 S. W., 227, Mr. Justice LURTON, whose opinions we have hereinbefore quoted, construing this provision of our statutes, says:

"We think that the purpose of the legislature, as manifested in this provision of the act authorizing the incorporation of mining and manufacturing companies, was to prevent the creation of debts in excess of capital stock by declaring such management to be a breach of trust."

And Mr. Justice McALISTER in *Moulton* v. *Connell-Hall-McLester Co.*, 93 Tenn., at page 389, 27 S. W., 673, directly declares that such excessive debts "were created in violation of law." And again, in *Tradesman Pub. Co.* v. *Car Wheel Co.*, supra, he says that such a "debt has been illegally contracted." Shall this court lend its aid to the enforcement of a contract, the obligation of which is so classed and characterized at the suit and for the benefit of the corporation whose claim is so tainted? "No principle . . . is better settled," said Judge WRIGHT (*Parks* v. *McKamy*, 3 Head, 298), "than that an action will not lie to enforce a contract made in violation of a statute, or of the common law, . . . or against pub-

lic policy.'' If this rule applies in law courts, it properly has even broader and stronger application in a court of equity.

Emphasis has hereinbefore been given to the fact that in the instant case the court is dealing with a contract wholly executory—not one performed by either party, in whole or in part. Even in cases of contracts void because *ultra vires* the rule generally recognized and approved in this State is that:

''When a contract by a private corporation, which is otherwise unobjectionable, has been performed on one side, the party who has received and retained the bene- fits of such performance shall not be permitted to evade performance on the ground that the contract was in excess of the [power] purpose for which the corporation was created.'' *Seymour* v. *Guaranty Asso., etc.*, 54 Minn., 147, 55 N. W., 907, quoted approvingly in *Tennessee Ice Co.* v. *Raine,* 107 Tenn., 158, 64 S. W., 30, by Mr. Justice WILKES, who says that ''there is a uniformity in the de- cisions that either party to an *ultra vires* contract, while retaining the benefits, is estopped to plead that the con- tract was *ultra vires* in order to defeat recovery.''

By analogy this rule has application to a contract made by a corporation without having secured subscriptions to its capital stock, when the contract has been per- formed by one of the parties.

In conclusion, while a controversy of fact is presented in this record as to the extent and binding quality of the subscriptions obtained to the capital stock, it is ap- parent (1) that only a relatively small proportion of the capital stock fixed in the charter had been in any man- ner subscribed; and (2) that the indebtedness created by the contract largely exceeded the capital stock paid in.

Giving applications to the principles so generally announced by the authorities reviewed, in harmony with our statutory provisions and what we conceive to be a sound public policy, this court must refuse to enforce the executory contract sued on in this case, and, affirming the chancellor, dismiss the bill.

Green, C. J. (dissenting).

With the utmost deference to my associates and to the learned justice delivering the opinion of the court, I must record by dissent.

While the law declared in the opinion may be wise and salutary, nevertheless it seems to me that certain rather plain statutory provisions were brushed aside in the road to the conclusions announced. The result reached appears to me a judicial repeal of section 26 of chapter 142 of the Acts of 1875, and section 1485 of the Code of 1858.

Section 26 of the Act of 1875 (Thompson's-Shannon's Code, section 2026), is as follows:

"The said instrument, when probated as hereinafter provided . . . with application, probates, and certificates, is to be registered in the county where the principal office of the company is situated, and also registered in the office of the secretary of State; and a certificate of registration given by the secretary of State, under the great seal of the State, shall when registered in the register's office of said county, with the *fac simile* of said seal, complete the formation of the company as a body politic; and the validity of the same in any legal proceeding shall not be collaterally questioned."

It is conceded that the requirements of the section quoted were met by those bringing out the corporation involved, and it follows that the formation of this corporation as a body politic was "complete." How can a corporation whose formation is "complete" be denied the right to enter into a lawful contract?

The attempted distinction between the right of a corporation "to be" and its right "to do" is inapplicable to the functions of a corporation whose formation is "complete." How can such a body be "complete" if it may not move as well as have its being?

The court denies the power of this corporation to enter into a contract in the prosecution of the very business it was chartered to conduct. What is this denial but an attack upon the validity or "complete" formation of this company, the very sort of collateral question the statute in terms forbids?

If it be said that I attach too much significance to the word "complete," that I give that word too broad a meaning, and that a corporation is not legally organized to contract until its capital stock is subscribed, there remains the other section of our corporation law to be considered.

Section 1485 of the Code of 1858 (Thompson's-Shannon's Code, section 2064), is as follows:

"No body of men acting as a corporation under the provisions of this chapter, shall be permitted to set up the want of a legal organization as a defense to an action against them as a corporation; nor shall any person sued on a contract made with such corporation, or sued for an injury to its property, or a wrong done to its interests,

be permitted to set up a want of such legal organization in his defense.''

Surely this statute has in mind the capacity of a defective corporation ''to do'' as well as its capacity ''to be.''

James and his associates were assuming to act as a corporation under the provisions of the act of 1875, and under the general provisions of the Code of 1858. They procured a charter, proceeded as a corporation, and contracted, as a corporation, with defendant. Defendant, being sued on its contract ''with such corporation,'' sets up a want of legal organization as a defense—that the capital stock of the corporation had not been subscribed —that the corporation was not therefore legally organized and empowered to make the contract. I do not see how a defense, expressly prohibited by statute, can be sustained. Yet, stripped of its embellishment, the majority opinion does that very thing.

The acquisition of subscriptions to the capital stock of a corporation is but a part of its organization, as that word is construed in all the cases I have seen. To deny a corporation the right to sue upon its contract because all its stock has not been subscribed is to repel the corporation because a detail of its organization was omitted.

Our statutes may be unwise, but they seem clear. They are certainly quite different from many statutes construed in the decisions cited in the majority opinion.